134

**NATIONAL CITY BANK OF NEW YORK
et al. v. CONTINENTAL NAT. BANK &
TRUST CO. OF SALT LAKE CITY.**
No. 1325.

*Circuit Court of Appeals, Tenth Circuit.
April 8, 1936.*

Frank A. Johnson, of Salt Lake City, Utah (A. L. Hoppaugh and Robert F. Mark, both of Salt Lake City, Utah, on the brief), for appellants.

Beverly S. Clendenin, of Salt Lake City, Utah (Harold P. Fabian, of Salt Lake City, Utah, on the brief), for appellee.

Before LEWIS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

KENNEDY, District Judge.

The appellants, plaintiffs in the court below, brought this suit in equity seeking to impress a trust upon $30,000 deposited in the defendant bank, growing out of a fraud perpetrated upon the plaintiffs. Issue was joined by answer, and upon final hearing findings of fact and conclusions of law were filed and a decree entered in favor of the defendant, from which plaintiffs appeal.

A sketch of the pertinent facts disclosed by the record is as follows: One Charles D. Waggoner was the president and manager of the Bank of Telluride, located at Telluride, Colo. In the year 1927, he negotiated a loan of $25,000 from the defendant bank, which continued in existence until September 3, 1929. The note was renewed from time to time and interest paid promptly. Some time during the summer of 1929, upon being pressed by the bank, Waggoner put up collateral as security for his indebtedness consisting of certain shares of stock in the Bank of Telluride and stocks in other banks and commercial companies, together with quitclaim deeds to certain real estate. On August 31, 1929, Waggoner forged telegrams in code purporting to come from the Denver correspondent of the New York banks and trust companies and of the Equitable Trust Company of which plaintiff De Mott is the assignee, by which they were induced to place in the Chase National Bank of New York a total of $500,000 to the credit of the Bank of Telluride. Later, and on the same day, Waggoner, who was in New York City, requested the Chase Bank to certify three checks on said bank which had been executed by the cashier of the Bank of Telluride, payable to Waggoner, covering the entire deposit of $500,000. One of these checks for the sum of $225,000 Waggoner indorsed to the order of the First National Bank of Pueblo, Colo., and transmitted it to the Pueblo bank, with directions to place the amount to the credit of the Bank of Telluride and to transmit $30,000 thereof to the defendant bank in Salt Lake City for the credit and account of one J. C. Anderson.

The Pueblo bank followed the instructions, transmitted the $30,000 to the defendant bank through the Walker Bank & Trust Company of Salt Lake City. The defendant bank received the $30,000 some time during the forenoon of September 3d from the Walker Bank and placed the same to the credit of said Anderson. Some brief time preceding this transaction Waggoner had communicated to the defendant bank his expectation that in a short time he would be able to take up his note of $25,000 through the assistance of a friend. Before going to New York City, Waggoner had instructed Anderson, a resident of Denver, to call up the defendant bank within a few days by telephone and in case a deposit had been made in Anderson's name there to use the deposit for the purchase of Waggoner's note and to instruct it to forward the note with the collateral security to Anderson, and that he (Waggoner) would call and get the securities at a later date. Some time during the afternoon of September 3, 1929, Anderson called the defendant bank by telephone and inquired if a deposit had been made, and, upon being informed that it had, he instructed the cashier to charge his account with the amount of the Waggoner note and to forward it with the pledged securities to him in Denver. During the course of the afternoon and before the close of banking hours, the transaction was completed by the defendant bank charging the Anderson account with the sum of $25,079.16 and transmitting the note and securities through the mails to Anderson as directed. Some time on September 4, 1929, a discovery was made of the fraud perpetrated by Waggoner, followed on the next day by general publicity given in the newspapers throughout the country. Also on that date, September 5th, the bank was called by telephone by one Borden, representing the plaintiffs, who advised the defendant bank of the fraud and requested said bank to hold the money received by it in the transaction for the benefit of plaintiffs. Upon being advised by the defendant bank that at the time it only had about $5,000 on hand, Borden requested that such amount be held for plaintiffs. In the meantime the defendant bank received a letter acknowledging the receipt of the Waggoner note and securities and inclosing a signature card of Anderson. On September 9, 1929, one B. M. Webster presented a check to the defendant bank signed by Anderson and also indorsed by him, covering the balance of the amount deposited in his name for the sum of $4,920.84, which was

accepted and the money in that amount paid to the payee, Webster. The bill in this case was filed August 29, 1933.

There appears to be no dispute between the parties as to the jurisdiction of the court to hear and dispose of the case on the equity side. The controversy naturally divides itself into two phases, which are separately discussed in the briefs, one relating to the payment of the note amounting to $25,079.-16, and the other to the payment of the check amounting to $4,920.84; the two making up the entire fund of $30,000.

■ It is contended by the appellants that the circumstances under which the $30,000 deposit was made were such as to put the bank upon notice that some one other than the depositor had an interest in the fund. We think that this contention cannot be sustained. The deposit came in the ordinary course of business, and, in view of the fact that Waggoner had previously advised the bank that he expected to secure the assistance of a friend in taking up his note, it was natural that the bank should recognize the instruction of Anderson by phone as the friend from whom Waggoner had received the promised assistance. In accordance with their theory and belief, the bank in due course following the instructions, charged the account of Anderson with the amount due upon the note, and transmitted the note with the securities to him. This clearly appears to be a very common and ordinary transaction in everyday banking, devoid of suspicious circumstances.

■ But it is again contended by appellants that, even though the defendant bank took over $25,079.16 of the deposit without any notice of the fraud of Waggoner, under the equitable rule, the appellants had the right to reclaim the amount unless the defendant bank could show that it had changed its position and had a superior equity in the deposit. This doctrine is predicated upon the decisions in Bank of Metropolis v. Bank of New England, 6 How. 212, 12 L.Ed. 409; Beaver Boards Companies v. Imbrie & Co. (D.C.) 287 F. 158; Fulton National Bank v. Hosier (C.C.A.) 295 F. 611; Harter Bank v. Inglis (C.C.A.) 6 F.(2d) 841; and Citizens' & Southern Bank v. Fayram (C.C.A.) 21 F.(2d) 998. Assuming that the rule of "changes position" is well established in cases in which there is no notice, yet the facts in the case at bar fully justify its application here. The position of the appellee has been changed to its detriment, in that in the due course of business it had surrendered not only the note of its debtor but the collateral security securing it as well. That at the time of the trial it had been determined that the securities were of little value is not controlling, although the record discloses that some of the securities had been disposed of for substantial sums. Again, if the rule be invoked that, where funds procured through fraud are traced into the hands of a third person, the burden of proof is placed upon the person holding such funds to show that they were acquired in good faith, as announced in Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956, and other cases cited, the burden is fully sustained in the case at bar by the proofs demonstrating beyond peradventure that the funds were acquired in good faith without notice and that the $25,079.16 was devoted to a legitimate and authorized purpose in the due course of banking. It is an impelling circumstance in this connection that the deposit was in the nature of money. It has been repeatedly held by the courts that money, unlike other articles of personal property, is not earmarked. As was stated in Holly v. Missionary Society, 180 U.S. 284, at page 293, 21 S.Ct. 395, 398, 45 L.Ed. 531, in adopting the language of the New York high court (Stephens v. Brooklyn Board of Education, 79 N.Y. 183, 35 Am.Rep. 511):

"'The law wisely, from considerations of public policy and convenience, and to give security and certainty to business transactions, adjudges that the possession of money vests a title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration.'"

As to the $4,920.84 item, a different situation is presented. This amount was paid out upon the check of Anderson on September 9th after the bank had been notified by the appellants that the $30,000 fund was the fruit of a fraudulent transaction and that they claimed ownership of the money, and likewise a notice to the defendant bank officials of the Waggoner transactions through the public press. This sum then stood to the credit of Anderson as a depositor in the bank, and, upon presentation of his check by an identified payee, the bank was confronted with an embarrassing situation. Although having been notified that the money then on deposit was a part of a fund procured by fraud which others claimed, but no proof of this claim having been presented, the demand was being made by defend-

ant's depositor through his check for the amount standing to his credit and it elected to pay its depositor upon his tendered check. Whether or not the bank is protected in its action in this respect is the question now presented.

The determination must be predicated upon the basis of two defenses: First, the consideration of a Utah statute; and, second, laches on the part of plaintiffs.

Utah R.S. 7-3-52 (Laws 1929, c. 52), pleaded by the defendant in its amended answer, reads as follows:

"*Notice of adverse claim not effectual without appropriate process.* Notice to any bank or trust company doing business in this State of an adverse claim to a deposit standing on its books to the credit of any person shall not be effectual to cause said bank to recognize said adverse claimant unless said adverse claimant shall also either procure a restraining order, injunction or other appropriate process against said bank from a court of competent jurisdiction in a cause therein instituted by him wherein the person to whose credit the deposit stands is made a party, or shall execute to said bank, a good and sufficient bond, in double the amount claimed indemnifying said bank from any and all liability, loss, damage, costs and expenses for and on account of the payment of such adverse claim or the dishonor of the check or other order of the person to whose credit the deposit stands on the books of said bank; provided, that this law shall not apply in any instance where the person to whose credit the deposit stands is a fiduciary for such adverse claimant, and the facts constituting such relationship, as also the facts showing reasonable cause of belief on the part of said claimant that the said fiduciary is about to misappropriate said deposit, are made to appear by the affidavit of such claimant."

This statute appears to be the embodiment in statutory form of a rule having its roots in the decisions of numerous courts. In Nehawka Bank v. Ingersoll, 2 Neb. (Unof.) 617, 89 N.W. 618, at page 620, the language of the court is as follows:

"Deposits in the bank create between it and the depositor, or the person to whom the credit for the deposit is given, the relation of debtor and creditor. So, where a bank receives money from a person, and gives him credit therefor, it is in duty bound to honor his checks to the amount of such deposit, and it cannot refuse to honor his checks or drafts against the fund on the ground that the money deposited belonged to some other person, or that the title of the depositor to it is defective. These are matters in which the bank is not interested or concerned until the third party who claims to own the fund shall proceed to enforce his rights. McLaughlin v. First Nat. Bank, 6 Dak. 406, 43 N.W. 715; First Nat. Bank v. Mason, 95 P. 113, 40 Am.Rep. 632; Central National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; Rock Springs Nat. Bank v. Luman, 6 Wyo. 123, 42 P. 874; Walker v. Manhattan Bank (C.C.) 25 F. 247, 255; Morse, Banks, § 317."

To a like effect is the decision in Ford v. Ames National Bank, 196 Iowa, 958, 195 N.W. 742. In Hulbert v. All Night & Day Bank, 29 Cal.App. 765, 157 P. 546, at page 547, the California court says:

"While it is true that a bank receiving a deposit of money may not, in the absence of proper legal proceedings to impound it, dispute a depositor's ownership thereof or refuse to honor his checks drawn thereon, nevertheless the real and true owner thereof may show his right to the fund. Hemphill v. Yerkes, 132 Pa. 545, 19 A. 342, 19 Am.St.Rep. 607; Patterson v. Marine National Bank, 130 Pa. 419, 18 A. 632, 17 Am.St.Rep. 778. The evidence establishing such right should be clear and unequivocal."

Decisions to the same effect might be multiplied, but enough have been outlined to indicate that the statute here involved has been enacted for the protection of banks in situations like the present by placing the burden upon some claimant to a bank deposit to take some affirmative steps by restraining order, indemnifying bond, or affidavit which will serve to protect the bank against damages which may be suffered by its depositor through the refusal of the bank to pay. Nor do we feel that such a statute is not binding upon a federal court of equity. These courts have repeatedly recognized and enforced rights and remedies provided by state statutes. Hughes on Federal Practice, at section 4124, lays down the rule as follows:

"The general rule has been stated that the statutes of the state are binding on the federal courts sitting within the state, and the exception that those statutes cannot enlarge or diminish the federal equity jurisdiction. But this exception does not deny to a party to a federal equity suit substantial rights conferred by the state statutes.

"Rights created and remedies provided by the statutes of a state, to be pursued in

the state courts, may be administered in the national courts in suits in equity, when the nature of the right and remedy is equitable; when the right conferred by the state statute is not in conflict with the Constitution or laws of the United States, as in contravening the constitutional provision entitling parties to a jury trial; or the federal statutory provision inhibiting suits in equity when there is a plain, adequate, and complete remedy at law; and when the federal court otherwise has jurisdiction of the subject-matter and of the parties, by reason of the citizenship of the latter and of the amount involved in the controversy."

Federal courts have recognized and enforced state redemption statutes, Brine v. Hartford Fire Insurance Co., 96 U.S. 627, 24 L.Ed. 858; statutory rights of set-off, Wisdom v. Guess Drycleaning Co. (D.C.) 5 F.Supp. 762; local laws concerning liens for attorney's fees, Security Mortgage Co. v. Powers, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236; and statutes making usurious contracts void, Missouri, Kansas & Texas Trust Co. v. Krumseig, 172 U.S. 351, 19 S.Ct. 179, 43 L.Ed. 474. Whether a conveyance will be held fraudulent as to creditors will be determined through the interpretation of local statutes by the federal courts. Anderson v. Gray (C.C.A.) 284 F. 770. Many similar examples might be given concerning the recognition of local statutes by federal courts, all involving substantive rights and not mere matters of form and procedure. We think that the trial court was authorized to apply the statute with respect to the plaintiffs' claim and thereby to absolve the defendant from liability. The statutory requirements, at least as invoked here, comport with the principles of equity in the defendant's favor.

It is suggested by appellants that, even though the statute should be held to apply in a federal court of equity, yet it is beyond the power of a state Legislature to control the duties and obligations of a national bank. In McClellan v. Chipman, 164 U.S. 347, 17 S.Ct. 85, 87, 41 L.Ed. 461, Mr. Justice White again announces the rule covering this subject in the following language:

"National banks 'are subject to the laws of the state, and are governed in their daily course of business far more by the laws of the state than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.' First National Bank of Commerce v. Commonwealth of Kentucky, 9 Wall. [353] 362 [19 L.Ed. 701].

"Second. 'National banks are instrumentalities of the federal government created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties, or control the conduct of their affairs, is absolutely void, whenever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiencies of these agencies of the federal government to discharge the duties for the performance of which they were created.' Davis v. Elmira Savings Bank, 161 U.S. 275, 283, 16 S. Ct. 502 [40 L.Ed. 700]."

There is obviously nothing in the Utah statute which tends to incapacitate a national bank from discharging its duties to the government or to impair its efficiency as an agency of the government.

The question of laches remains for consideration. The application of this doctrine depends upon the facts and circumstances of each individual case. Here the plaintiffs knew that the money was on deposit on September 5th and still took no steps to assert their claim to it in any legal form before the money was paid out on September 9th, upon the demand of the depositor, nor in fact until this suit was instituted nearly four years after the transaction took place. In the memorandum opinion of the trial judge appears a quotation from a decision of the Court of Appeals of Missouri, reported in Drumm-Flato Commission Co. v. Gerlach, 107 Mo.App. 426, 81 S.W. 503, 505, which seems pertinent to the situation here:

"Any one claiming money deposited in a bank to the credit of another ought to be required to exercise the same diligence in taking legal steps to assert his claim thereto that a reasonably prudent and diligent person would exercise in attaching the property of his debtor when satisfied that such debtor is about to make a fraudulent disposition of his property, or to remove the same from the state."

Laches on the part of the plaintiffs was clearly established in this case. The decree of the trial court should be, and is, affirmed.