240 A.2d 586.

WESTERLY COMMUNITY CREDIT UNION *vs.*
INDUSTRIAL NATIONAL BANK OF PROVIDENCE.

APRIL 15, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is a civil action[1] equitable in nature wherein the plaintiff seeks to have the defendant bank declared a constructive trustee of $1,200. After a trial before a justice of the superior court, judgment was entered for the plaintiff for $565 together with interest thereon and

[1] On March 1, 1956, this suit was instituted in the superior court as a bill in equity and a trial on this matter was conducted on April 8, 1957. At the conclusion of the day's testimony the case was continued until April 16, 1957. During the week which followed, the trial justice became incapacitated by reason of illness and thereafter the case lay dormant for almost 10 years when the plaintiff's motion for further hearing was granted. The record shows that during this interval, the whereabouts of Bemis has become a mystery still unsolved. This period of dormancy, in our opinion, is regrettable. We point out that the expeditious disposition of litigation is the obligation not only of the bench but the bar as well.

costs. This· case is before us on the plaintiff's appeal from that judgment.

The defendant in the instant case is Industrial National Bank of Providence, successor to Providence Union National Bank, and plaintiff is the Westerly Community Credit Union. Hereafter we shall refer to plaintiff as either plaintiff or credit union and defendant as defendant or bank.

J. William Timperley was superintendent of a large textile plant in Kenyon, Rhode Island, and maintained his checking account in defendant bank. The balance of this account on December 1, 1953 was $987.32. During the ensuing month, an acquaintance of Mr. Timperley named Frederick E. Bemis forged Timperley's signature as maker on a total of 16 checks all of which were made payable to Bemis's order. The checks are divided into two series, with eight checks in each series; the first series was those honored and paid and debited to Timperley's account by defendant and the second series was those checks dishonored and returned by defendant for being forged instruments. Although Bemis was described in plaintiff's complaint as one of its employees, this allegation was denied at the trial by Bemis. In its brief plaintiff asserts that Bemis worked for Timperley. We can find nothing in the record to support this allegation. For purposes of this appeal we are unable to characterize the relationship, if any, between the forger, Bemis, and plaintiff or between the forger and Timperley.

The first series of checks forged by Bemis, numbered eight, occurred between December 17, 1953 and December 22, 1953. While the checks varied in amount, the sum total equaled $635. The checks were endorsed by Bemis and cashed at various commercial enterprises in Westerly, Rhode Island; two of the eight were cashed at plaintiff's office in Westerly. All the checks were deposited in a

Westerly bank and followed the usual banking channels to defendant. The last of these checks was honored by defendant on December 30, 1953.

On December 21, 1953, Bemis initiated the second series of bogus checks which also numbered eight. These checks amounted to $2,210 and were all cashed at plaintiff's office in Westerly. With the money he received from plaintiff, Bemis paid a portion of a debt he owed to plaintiff and thereafter on three separate occasions made deposits totaling $1,200 to Timperley's checking account at defendant's office in Wakefield. At the trial, Bemis testified that the $1,200 deposited by him on these occasions represented a part of the proceeds which he derived from the second series of forged checks. The first deposit of $200 was made on December 23, 1953, the second deposit of $400 was made on December 28, 1953, and the last deposit of $600 occurred on December 30, 1953. Officials at the bank were aware that these deposits were made by Bemis but attached no particular significance to that fact. On or about December 30, 1953, however, after receiving a phone call from Bemis relative to Timperley's account, the bank's officers became suspicious and invited Timperley to the bank for discussion on the matter.

Timperley arrived at defendant's Wakefield office on January 2, the first business day of the new year. He examined the bank statement and the eight cancelled checks comprising the first series of forgeries then in the bank's possession.[2] After studying the available records, he indentified the forged checks and the three deposits made by Bemis to his account. Thereupon, Timperley signed an affidavit in which he averred that the three deposits totaling

---

[2]It is clear from the stampings imprinted on the second series of forged checks by the various banks which handled them during the course of the clearing procedure that none of the drafts in the later series had arrived at defendant's place of business at this point in time.

$1,200 were not made by him nor were they made with his "consent, knowledge or authority" and that eight checks, which he describes and designates with particularity therein, were never issued by him and were forgeries. In the same affidavit, he orders and directs the bank to withdraw from his account the $1,200 of deposits made without his knowledge or acquiescence and authorizes the bank to "cover and reimburse itself" for the eight forged checks he identified.

Two days later, on January 4, 1954, pursuant to Timperley's directives, defendant charged the Timperley account for the $1,200 deposited therein by Bemis and credited it in the amount of $635, which represents the value paid out by the bank when it honored the first series of forgeries. The bank then extracted, again pursuant to Timperley's authorization, $635 from the $1,200 it had withdrawn from Timperley's account to cover and reimburse itself for the loss it sustained in honoring the forged instruments. The balance remaining after these transactions, namely $565, was then deposited in the new account entitled "Timperley-Bemis, Special Account." In the days which followed, the second series of Bemis's forgeries began to arrive at defendant's bank, but they were seasonably dishonored and charged back to plaintiff with a notation that the signatures thereon were forged. Some two months later, plaintiff commenced this litigation.

The plaintiff contends that Bemis's fraudulent conduct was something akin to larceny. Therefore, it argues, no title to the stolen money was ever passed by Bemis to defendant bank when such money was deposited in Timperley's account. The defendant takes the position, on the other hand, that it owed no duty whatsoever to plaintiff until such time that it had notice that the money in its possession belonged to plaintiff and that its sole duty in this case was to turn over to plaintiff the balance contained in the "Timperley-

Bemis, Special Account." The defendant makes no claim to the balance remaining in the special account. This appeal therefore is concerned only with the rights of the parties relative to the $635 which the bank used to extinguish the loss incurred by it on account of its honoring the first series of forged checks.

In awarding plaintiff the $565 balance in the account, the trial justice ruled that since the bank must be considered to have given valuable consideration to the extent that it honored the first series of forged checks which totaled $635, and moreover since the defendant bank acted in good faith and without notice of plaintiff's equitable interest in the $1,200 deposits, it rightfully reimbursed itself for the loss that it had incurred.

In arriving at his decision, the trial justice indicated that he relied principally on this court's holding in *Smith* v. *Pendleton*, 53 R. I. 79, 163 A. 738, where we said at 86, 163 A. at 740, "One who receives money in good conscience and has practiced no deceit or unfairness in obtaining it is under no legal obligation to return it to one from whom it has been obtained by deceit on the part of another." Although he did not specifically declare that he was permitting the bank the right of setoff against Bemis, the trial justice by implication at least so held.

Generally, the issue to be resolved in this appeal is whether or not the bank could exercise a setoff under the rather peculiar factual circumstances which gave rise to this action. If for any reason it is found that the bank could not employ such a setoff, the decision of the trial justice must necessarily be overturned.

As a general rule a bank may look to deposits in its possession for repayment of any matured indebtedness owed to it on the part of a depositor. *Adelstein* v. *Jefferson Bank & Trust Co.*, Mo., 377 S.W. 2d 247. Such a right in the bank grows out of the contractual relationship existing between

the depositor and the bank which arises at the time the depositor delivers and commits money to the bank's custody. In the absence of any specific agreement to the contrary, the contract of deposit causes a debtor-creditor relationship to exist between the bank and the depositor and all the rights and obligations each may owe to the other with respect to the fund deposited are determined by the terms of this contract. *Griffin* v. *Centreville Savings Bank*, 93 R. I. 47, 171 A.2d 204; 9 C.J.S., "Banks and Banking," §296 at 616-17. On an ordinary general deposit, the law considers the currency so deposited to be the property of the depository bank; quite naturally, therefore, the bank is regarded by law to have legal title to the deposited funds and is considered to be indebted to the depositor for such sums. 10 *Am. Jur.*2d, "Banks and Banking," §666 at 636.

The right of a bank to apply deposits to extinguish a debt owed to it by a depositor is referable to principles of equity and in some states receives additional support from statutory law; neither source of the right, however, is paramount or absolute and yields in the face of superior equities found in third persons. *First Nat'l Bank* v. *Winkler*, 139 Tex. 131, 161 S.W.2d 1053; 5A *Michie, Banks and Banking*, chap. 9, §114 at 274-75; 9 C.J.S. "Banks and Banking," §296 at 614-15.

It seems clear under the facts of the present controversy that Bemis, the forger, was a constructive trustee as to the $1,200 he deposited in Timperley's account. In most jurisdictions the right of a bank to apply a deposit consisting of trust funds or funds belonging to one other than the depositor to the individual indebtedness of the depositor, depends upon whether the bank knows or can properly be charged with knowledge of the trust character or true ownership of the funds. 10 *Am. Jur.*2d, "Banks and Banking," §675 at 647; see 2 *Restatement Trusts* 2d, §324, comment i, p. 121. It is uniformly held that where a bank has actual knowledge that sums deposited with it belong not to

the depositor but to a third party the bank is absolutely precluded from applying such funds against a debt owed to it by the depositor individually. *National Indemnity Co.* v. *Spring Branch State Bank,* 162 Tex. 521, 348 S.W.2d 528; *Ryan Brothers, Inc.* v. *Curwensville State Bank,* 382 Pa. 248, 114 A.2d 178; *Emile* v. *Bright,* Fla., 203 So.2d 328; 5A Michie, *Banks and Banking,* §141 at 346. It is also a generally accepted rule that where a bank, although having no actual notice of the character of funds deposited with it, has knowledge of circumstances sufficient to necessitate inquiry upon its part, the bank cannot, as against the true owner, divert such funds to liquidate an individual indebtedness of the depositor to the bank. *National Indemnity Co.* v. *Spring Branch State Bank, supra;* 9 C.J.S., "Banks and Banking," §302 at 627; 8 A.L.R.3d 235 at 242, §4.

There is divisiveness in legal authority, however, as to the law applicable in the situation where the bank lacks knowledge that the deposited funds belong to a third person and is without sufficient information to charge it with a duty to inquire as to the character of the deposit. The differences of opinion on this issue are amply discussed and analyzed in 8 A.L.R.3d 235; 9 C.J.S., "Banks and Banking," §302 at 626; 38 *Harv. L. Rev.* 800; 5 *Minn. L. Rev.* 470, and 13 *Minn. L. Rev.* 242; 5A Michie, *Banks and Banking,* §§136 and 141; 10 *Am. Jur.*2d, "Banks and Banking," §676 at 648-49. A considerable number of courts seems to favor a right of setoff in a bank so long as it can be shown the bank had neither actual nor constructive knowledge of any third person's equitable interest in the deposited funds. 10 *Am. Jur.*2d, "Banks and Banking," §676 at 648-49. The rationale behind the application of this rule is premised on the policy that a creditor should not be required to investigate the source of funds paid to him by his debtor in satisfaction of an obligation owed to him. 10 *Am. Jur.*2d *id* at 649. The contrary view strongly espoused by numerous authorities holds that a bank under such circumstances may not exer-

cise a right of setoff unless it has changed its position or superior equities have been raised in its favor. See 8 A.L.R.3d 235 at 249, §8, and cases cited therein. This qualified right of setoff is commonly known as the "equitable" rule in banking law.

Counsel for plaintiff suggests that our decision in *Hungerford* v. *Curtis,* 43 R. I. 124, 110 A. 650, stands for the proposition that Rhode Island is among those jurisdictions recognizing the equitable rule. This suggestion is bolstered somewhat by a reference in a footnote by the supreme court of Texas in *National Indemnity Co.* v. *Spring Branch State Bank, supra,* which classifies our holding in *Hungerford* among those jurisdictions which adhere to the equitable rule on notice. See 162 Tex. 521, n. 1, 524, 348 S.W.2d 528, n. 1, 529-30. We wish to make it clear, however, that *Hungerford* v. *Curtis,* in our opinion does not crystallize our position on this issue. In the *Hungerford* case it was clear that no setoff right could exist since the bank concededly never treated the perfidious trustee who deposited and personally used funds belonging to another as a depositor of the bank.

Hence, we regard the instant case as being our first opportunity to rule on whether we shall require more than a lack of notice on the part of banks before a setoff can be employed to extinguish a preexisting debt of a depositor.

After due consideration of the cases supporting the two rules, we wish to align this jurisdiction with those which hold that absent any actual or constructive notice on the part of a bank, it has a right to setoff debts owed to it by depositors. Our decision in this regard is principally influenced by our desire to affix finality to the payment of obligations owing to creditors — be they banks, corporations, partnerships or individuals. We do not believe it should be required of any creditor to inquire or investigate the source of funds which is received in payment of a liability. See

10 *Am. Jur.*2d, "Banks and Banking," §676 at 649. *cf. National City Bank* v. *Continental Nat'l Bank & Trust Co.,* 83 F.2d 134; *Smith* v. *Pendleton, supra.*

In the present matter there is no dispute relative to the trial justice's finding that the bank in using the $635 deposited by Bemis to satisfy his liability to it acted in good faith and without actual or constructive notice of the equities of the credit union; accordingly, therefore, under the rule of law expressed in the preceding paragraph, the bank is deemed to have acted within its rights in exercising its setoff against Bemis insofar as the notice element is concerned.

It is to be understood, however, that all the other elements of a setoff must be present before such a right can be exercised by banks. See 5A Michie, *Banks and Banking,* §115; 10 *Am. Jur.*2d, "Banks and Banking," §§666 et seq. The single element of a setoff which merits further discussion in this case is the necessity of establishing a mutual debtor-creditor relationship between the bank and Bemis. By this we mean that first it must be found that Bemis is a debtor of the bank, and secondly, that the bank is in turn a debtor of Bemis relative to the $1,200.

As to the first part, there can be no question that Bemis was a debtor of the bank up to the amount it paid on the first eight forged checks. As to the second part, it need be demonstrated that the bank enjoyed a normal depositor-depositee relationship with Bemis as regards the $1,200 it had withdrawn from Timperley's account. In our opinion, therefore, this is the critical element to be examined in this case. To put it a different way, the precise question to be decided by us is whether or not the bank, as to the $1,200 extracted from Timperley's account, held such funds in a manner which could be said to have created a debtor-creditor relationship between itself and Bemis. If our answer to this issue is affirmative, the bank can be said to have

properly setoff the $635 which Bemis owed to it; if on the other hand, our answer to the question posed is negative, the bank has no right of setoff and the decision of the trial justice must be reversed.

There would be no problem with this particular facet of the controversy if Bemis had deposited the money in his own account, for the law is fairly clear that proceeds fraudulently obtained by a person and deposited in his own account may be applied by the bank to satisfy a matured indebtedness of the fraudulent depositor. *Bogle* v. *Shaffer State Bank,* 203 Iowa 203, 212 N.W. 547; 5A Michie, *Banks and Banking,* §145 at 357. Nor would there have been a serious problem if Timperley, instead of disclaiming interest in the $1,200 deposited in his account by Bemis as he did in his affidavit, had accepted the $635 as repayment for the amounts fraudulently withdrawn by Bemis through the first series of forgeries. Certainly, it is clear that if Timperley had accepted $635 of the funds deposited in his account by Bemis in good faith and without notice of plaintiff's interest therein, the bank's liability on the first series of forged checks would have been extinguished and the issue of setoff along with it. See *First National Bank* v. *Cloud State Bank,* 213 Ill.App. 485.

In the instant case, however, the forger for reasons of his own, deposited part of the proceeds he acquired through his second series of forgeries in the very account on which his bogus checks were drawn. This peculiar quirk of circumstance has seemingly no precedent. An extensive study of review of case law and legal commentary relevant to this case has failed to shed much enlightenment on the issue now confronting us. It is in this unusual posture that we formulate our decision in this case.

In a few earlier cases, there can be found some discussion on issues which are at least collaterally related to the one at hand. These cases suggest that when a person deposits

money which belongs to a third party in the bank account of another, without ever receiving the consent or authorization of the person in whose account the money is placed, the bank is regarded as never having received title to the deposited sum and moreover stands as a converter of these funds vis-à-vis the true owner. See *Patek* v. *Patek,* 166 Mich. 446, 131 N.W. 1101; *Gillette* v. *Liberty Nat'l Bank,* 95 Okla. 76, 218 P. 1057; *Kidder* v. *Hall,* 113 Tex. 49, 251 S.W. 497;. 10 *Am. Jur.*2d, "Banks and Banking," §344 at 308. In our opinion however, these citations do not represent sound precedent for deciding the issue now before us. We find it difficult to label a bank, which has received funds in the normal course of business and without notice of outstanding equities, a "converter" of the true owner's funds.

A better view in our opinion would be to characterize the bank as having received legal title to the funds when they were delivered to its custody for the benefit of Timperley. Thus, the sum entrusted to the bank is to be considered the property of the bank as would any normal deposit and the debtor-creditor relation as to this money would exist between the bank and Timperley—subject to Timperley's acceptance thereof. This is so because money deposited in the account of another is presumed to belong to or to be due the owner of the account. *Guardianship of Coolidge,* 12 Wis.2d 58, 106 N.W.2d 282; *Rice* v. *Ransom,* 8 Cal. Rpt'r 840, 186 C.A.2d 191; 9 C.J.S., "Banks and Banking," §287 at 597. At the moment Timperley disclaimed interest in the money deposited in his name, however, the bank, instead of being a converter of such moneys, merely became a holder thereof for the benefit of the person who deposited the money. See *Gaines Bros. Co.* v. *Fourth Nat'l Bank,* 198 Okla. 310, 179 P.2d 145; 5A Michie, *Banks and Banking,* §43b at 107-08. The bank clearly has title to the sums deposited by Bemis and is deemed to be holding such sums for the benefit of Bemis whom it knows to be the depositor.

The very narrow question to be resolved, therefore, is whether there exists a depository contract between the bank and Bemis which creates a debtor-creditor relationship by virtue of which the bank could invoke a right of setoff.

Banking law clearly provides that the relationship of debtor-creditor which arises between a bank and a depositor in regards to funds deposited with the latter is contractual in nature and requires for its establishment the mutual assent, express or implied, of the parties. *Clabbey* v. *First Nat'l Bank*, Mo., 320 S.W.2d 738.[3]

Under the facts of the present case, we do not believe such a meeting of the minds ever took place. In our opinion the bank did not intend to hold these funds in the manner in which it held normal deposits. This finding seems justified by the fact that the bank satisfied Bemis's liability to it before it ever placed any of the $1,200 of deposits in the "Timperley-Bemis, Special Account."[4] As it was, the bank placed in this special account only the balance which existed after it had deducted from the total deposits of Bemis the money it paid to Timperley in satisfaction of its liability to him for its honoring the first series of forgeries. Furthermore, we do not believe that it can be said that

[3]It has been generally held also that money deposited by a third party in the account of a person without the latter's consent or acquiescence therein, does not create a depository contract between the bank and the owner of the account. The rationale of this holding is predicated upon the theory that the contractual relationship of debtor-creditor running between depositors and banks cannot be created by the unauthorized, independent acts of third parties. See *Security State Bank* v. *W. R. Johnston & Co.*, 204 Okla. 160, 228 P.2d 169.

[4]As further evidence that the bank never regarded itself as holding the $1,200 as a general deposit for Bemis, we note that the bank entitled the new account which it created as a receptacle for the funds deposited by Bemis as a "Special Account." This designation itself is inconsistent with any argument advanced in its behalf that it intended to hold these funds in a general depository account, which, unlike special accounts, is adaptable for setoff payment. See 10 *Am. Jur.* 2d, "Banks and Banking," §360 at 320, for differences and distinctions between general and special deposits.

Bemis impliedly assented to the creation of a new general depository account in his name. In fact, there is no evidence on the record from which one could infer that Bemis ever knew this special account was created until well after the setoff took place.

For these reasons, therefore, we are constrained to find that since there existed no debtor-creditor relationship between the bank and Bemis in regards to the $1,200 deposited in Timperley's account which could provide the legal basis for a setoff, the bank improperly withdrew $635 from the funds deposited by Bemis; and accordingly the decision of the trial justice to the contrary is reversed.

The plaintiff's appeal is sustained, the judgment of the superior court is vacated and the cause is remanded to the superior court for the entry of a new judgment in accordance with this opinion.

*Edward F. J. Dwyer,* for plaintiff.

*Charles F. Cottam,* for defendant.