**RBS CITIZENS BANK, N.A.**

v.

**Howard F. ISSLER.**

**Kimberly Issler (Intervenor).**

**No. 2009–356–Appeal.**

Supreme Court of Rhode Island.

June 16, 2011.

---

Marc D. Wallick, Esq., Warwick, for Plaintiff.

Gerard M. DeCelles, Esq., for Intervenor.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

The intervenor, Kymberly[1] Issler (Kymberly or intervenor), appeals from an order of the Superior Court granting a "motion to charge garnishee," which motion had been made by the plaintiff, RBS Citizens Bank, N.A. (Citizens or the bank). On appeal, the intervenor contends that the hearing justice erred in permitting Citizens to attach funds in a particular bank account in order to satisfy a judgment that Citizens had obtained against the intervenor's estranged husband, Howard F. Issler, where the funds in that particular account allegedly belonged to the intervenor alone.[2]

---

1. The intervenor's name appears in the record as both "Kimberly" and "Kymberly" Issler. Since we observe that she spelled her own name "Kymberly" in the filings that she signed individually, we shall hereinafter do the same.

2. For the sake of conciseness, we shall hereinafter frequently refer to Kymberly Issler and

This case came before the Supreme Court for oral argument on February 1, 2011 pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the arguments of counsel, we are satisfied that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the order of the Superior Court.

# I

## Facts and Travel

On March 24, 2008, Citizens filed a complaint against Howard in the Superior Court for Kent County, seeking to recover funds allegedly owed to the bank in connection with a line of credit that the bank had extended to him. On April 28, 2008, judgment entered against Howard in the amount of $14,877, plus interest and costs; execution on the judgment issued and was returned unsatisfied. Citizens subsequently moved for a writ of attachment with respect to Howard's property; it sought to attach, *inter alia,* any of Howard's property that was in the possession of Citizens. On December 31, 2008, Howard was served with a copy of the writ of attachment; and, on January 5, 2009, he was served with a "Notice of Attachment," which stated that his "property or funds held by Citizens Bank [had] been attached and may be released" to his creditor, Citizens; the notice further stated that a hearing had been scheduled, during which he could "claim an exemption" which might "stop the attachment."

Thereafter, Kymberly moved to intervene in the civil action that Citizens had brought against Howard, and she objected to the attachment and to "the release of any funds" to Citizens. In her motion, Kymberly stated that she was moving to intervene "in order to assert her right to funds [that had been] improperly and illegally attached" by Citizens. In her objection to the attachment, she asserted (1) that the attached funds had been "improperly and illegally deposited into" a Citizens account in Howard's name and (2) that the funds actually "belong[ed]" to her.

In an affidavit submitted to the Superior Court in connection with her motion to intervene, Kymberly stated that she was a licensed motor vehicle dealer "authorized to do business under the name Ram Auto Sales, Inc." (Ram). She further stated that she had sold a vehicle on December 23, 2008 and had made arrangements with Bristol County Savings Bank (Bristol) for it to provide financing for the purchaser. Kymberly's affidavit also indicated that she had "established a business relationship with Bristol * * * wherein it would wire loan proceeds directly to Ram's Citizens Bank account, number 14962764."[3] Kymberly averred that, on or about December 26, 2008, Bristol wired $19,965 to the Ram corporate account at Citizens. She also stated, upon information and belief, that Citizens then "diverted" the funds that had been wired by Bristol to Citizens account number 20792751; the latter account was in her name as well as in the name of Howard, whom she described as her "estranged husband."[4]

---

Howard F. Issler by their first names. We certainly imply no disrespect.

**3.** We shall hereinafter refer to Ram's account at Citizens (account number 14962764) as "the Ram corporate account."

**4.** We shall hereinafter refer to Kymberly and Howard's account at Citizens (account number 20792751) as "the personal account."

Kymberly stated in her affidavit that the diversion of funds to the personal account was "without [her] direction or permission;" she added that Howard had "no interest whatsoever in the attached funds." She also stated that she had "demanded the wired funds" from Citizens but the bank "refused to issue a check to [her];" she averred that she had made that demand on December 29, 2008—two days *before* Citizens served the writ of attachment. She added that Citizens had refused to do as she had asked.[5]

On January 16, 2009, a hearing was held with respect to the attachment issue and with respect to Kymberly's motion to intervene in Citizens' civil action against Howard. On January 23, 2009, the hearing justice issued an order granting the attachment and also granting Kymberly's motion to intervene.

Citizens thereafter filed a "motion to charge garnishee" to enable it to reach the funds in the personal account, to which motion Kymberly objected. In support of its motion, Citizens argued[6] that it had a right to reach the funds in the personal account in order to satisfy the judgment that it had obtained against Howard. Citizens noted that the terms of Howard's credit agreement with Citizens explicitly gave the bank the right to "setoff funds held in any account * * * that you have with us or any of our affiliated banks to pay off or reduce your obligations to us

there under." On that basis, Citizens argued that, because Howard was a signatory on the personal account (along with Kymberly) and had access to the funds in that account, Citizens could reach the funds in the personal account by virtue of the terms of the just-quoted credit agreement.

Citizens also contended that the diversion of the funds wired by Bristol to the personal account had been proper. Citizens stated that, "at the time of the transfer and receipt of those funds," the Ram corporate account was "in an overdraft status and it had in fact been closed;" the bank indicated that that was the reason why it was necessary to divert the funds to a different account. Citizens asserted in its memorandum of law that "an agent" for the bank had spoken with Kymberly and had explained that the Ram account was closed. The bank further stated that, in a conversation between Kymberly and one of its agents, "it was discussed and authorized that the monies involved would be transferred into her open account [*viz.*, the personal account which she held with Howard] and that the overdraft status of the Ram Account would be satisfied in full from the monies received * * *." Citizens contended that, for those reasons, the diversion of funds "was done with [Kymberly's] specific approval and authorization."[7]

Finally, Citizens argued that it would have had a right to reach the funds that

---

5. Kymberly also submitted to the Superior Court an affidavit from Howard, in which he averred that he was a signatory on the personal account, that funds in the amount of $19,965 were deposited into that account "without [his] knowledge, direction or permission," and that at no time had he had any direct or indirect interest in said funds.

6. We note with dismay that Kymberly has not provided this Court with a transcript of the Superior Court hearing on the motion to charge garnishee; we have nevertheless been able to glean the parties' respective argu-

ments from the memoranda of law which were submitted prior to that hearing.

7. In support of its argument that Kymberly had authorized the diversion of funds to the personal account (number 20792751), Citizens submitted a copy of "internal notes" that it seems were taken by a Citizens employee during telephone discussions with Kymberly. The heading of the typed notes refers to "Acct.: 14962764" and to "RAM AUTO SALES."

had been wired by Bristol so as to satisfy the judgment against Howard, even if the funds had been successfully deposited into the Ram corporate account; Citizens premised that argument on the fact that Howard was also a signatory on the Ram corporate account. Citizens pointed out that, although the Ram account was originally opened as a corporate account, Ram had lost its corporate status in October of 2008,[8] which event, Citizens contended, effectively converted the Ram account into a personal account to which Howard had access as a signatory.[9] Citizens further noted that Kymberly had never taken any steps to remove Howard as a signatory on the Ram account.

In objecting to Citizens' motion to charge garnishee, Kymberly denied that she had ever, in her words, "directed" Citizens to divert to the personal account the funds that had been wired by Bristol to the closed Ram corporate account; and she argued that, for that reason, the funds should either have been deposited in the corporate account or returned to Bristol. Although Kymberly acknowledged that Howard was a signatory on the Ram corporate account as well as on the personal account, she asserted that Howard was "merely" a signatory on the corporate account and was not a joint account owner; she argued that there was no authority to

support the proposition that Ram could be held liable for the personal debt of a signatory on a corporate account. She also argued that Citizens could not legally attach the funds in the personal account to satisfy the judgment against Howard because Citizens knew that the funds wired by Bristol belonged to her and not to Howard.

On May 25, 2009, a hearing was held on Citizens' motion to charge garnishee and on Kymberly's objection to the attachment of funds; on June 5, 2009, an order entered granting Citizens' motion and denying and overruling Kymberly's objection. In the order, the hearing justice noted that Howard was a signatory on both the personal account and the Ram corporate account. The hearing justice ruled that Citizens had a "clear right to setoff, pursuant to its customer agreements, the line of credit agreement which Mr. Issler signed, and established case law," citing this Court's opinions in *Paradis v. Greater Providence Deposit Corp.*, 651 A.2d 738 (R.I.1994), and *Couture v. Pawtucket Credit Union*, 765 A.2d 831 (R.I.2001). Kymberly filed a timely notice of appeal.

## II

### Standard of Review

[1, 2] When reviewing a ruling made by a hearing justice with respect to a

---

In entries dated "12/30/08" and "12/31/08," the occasionally cryptic notes read in pertinent part as follows:

"REVIEWED ACCT WITH MNGR PER IDA I ADVSEDMC FUNDS WILL BE DEP INTO R/A WITHIN 4 BUSN DAY FROM DAY OF DEP, MC VERY UNCOOPERATIVE KEPT SAYING SHE WANTS *HER $$ TODAY*, I FINALLY HAD TO DISC CALL * * * SHE IS TRYING TO GET HER FUNDS FROM A 19000.00 DDEP. ADVISED HER THAT TH E DDEP WILL PIF FOR 1,010.72 AND THE EXESS FUNDS WILL BE DEP INTO HER OPEN ACCT BY THURSDAY OR FRIDAY * * * MC CI

WANTS TO KNOW WHEN HER REFUND WILL BE DEP INTO OPEN CHECKING ACCT MC *WANTS MOENY DEP INTO ACCT # 20792751 * * *.*" (Emphasis added.)

8. Kymberly acknowledged in her memorandum of law submitted to the Superior Court that "Ram Auto Sales, Inc.'s Articles were revoked on October 20, 2008."

9. The personal account that Citizens contends effectively came into being when Ram lost its corporate status is not to be confused with the personal account (number 20792751) that is at the center of the instant controversy.

motion in a civil case, this Court will "accord deferential consideration to the findings made by the hearing justice, and in the absence of our being able to determine that he [or she] was clearly wrong, or had misconceived or overlooked material evidence, we will not disturb his [or her] findings." *City of Providence v. Employee Retirement Board of Providence*, 749 A.2d 1088, 1093 (R.I.2000); *see also State v. Quinlan*, 921 A.2d 96, 105 (R.I.2007). We give the same degree of deference to a hearing justice's ruling on "mixed questions of law and fact, as well as [to] the inferences and conclusions drawn from the testimony and evidence." *Associated Builders & Contractors of Rhode Island, Inc. v. Department of Administration*, 787 A.2d 1179, 1184 (R.I.2002) (brackets in original) (internal quotation marks omitted); *see also Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 97 (R.I.2006).

Further, "[i]n Rhode Island, the rights and obligations of a bank and its depositors in regard to funds on deposit are governed by the terms of the contract entered into at the time the relationship is established." *Couture*, 765 A.2d at 834 (quoting *Paradis*, 651 A.2d at 740). Where joint account holders sign a signature card for an account, they accept the terms and conditions thereon and are "contractually bound" by such terms. *Couture*, 765 A.2d at 834; *see also Paradis*, 651 A.2d at 740. And, since the law of contracts is implicated, we note that "[i]t is a fundamental principle of contract law that the existence of ambiguity *vel non* in a contract is an issue of law to be determined by the court." *Gorman v. Gorman*, 883 A.2d 732, 738 n. 8 (R.I.2005); *see also Irene Realty Corp. v. Travelers Property Casualty Co. of America*, 973 A.2d 1118, 1122 (R.I.2009). This Court has further stated that, "[u]nder established contract law principles, when there is an unambigu-

ous contract and no proof of duress or the like, the terms of the contract are to be applied as written." *Gorman*, 883 A.2d at 739 n. 11.

## III

### Analysis

On appeal, Kymberly continues to contend that Citizens had "no right" to divert to the personal account the funds originally wired by Bristol to the Ram corporate account. She denies that she "directed" that there be such a diversion; accordingly, she argues that the funds should either have been deposited into the Ram account or been returned to Bristol. She additionally argues that the hearing justice erred in relying on this Court's decisions in *Paradis* and *Couture* when he determined that Citizens had a right to set off funds in the personal account so as to satisfy the judgment against Howard; Kymberly submits that those cases are factually distinguishable from the situation which gave rise to the instant case.

In response, Citizens acknowledges that it is "disputed whether or not [Kymberly] agreed to [the] transfer" of funds from the Ram corporate account to the personal account, but it argues that this factual dispute is irrelevant because Howard was a signatory on both accounts; the bank contends that, in view of that fact and this Court's precedent, it could legally attach funds in either account in order to satisfy the judgment that it had obtained against Howard—even though he did not personally contribute any of the funds subject to the attachment.

With respect to the issue of whether Kymberly directed Citizens to divert the funds to the personal account, we first note that Kymberly has not provided this Court with a transcript of the May 25, 2009 Superior Court hearing concerning

Citizens' motion to charge garnishee and her objection to the attachment. *See Mattatall v. State*, 947 A.2d 896, 901 (R.I.2008) ("This Court has declared on numerous occasions that it is risky business for a party to appeal without providing the Court with a transcript of the Superior Court proceedings.") (internal quotation marks omitted); *see also Hagopian v. Hagopian*, 960 A.2d 250, 254 (R.I.2008). For the purpose of reviewing the Superior Court's analysis, we have before us only the hearing justice's one-and-a-half page order; as a result, we do not have a sufficient basis for reviewing any determination that was made regarding the factual dispute between the parties with respect to the diversion of funds issue. *See 731 Airport Associates, LP v. H & M Realty Associates, LLC*, 799 A.2d 279, 282 (R.I. 2002) ("Unless the appeal is limited to a challenge to rulings of law that appear sufficiently on the record and the party accepts the findings of the trial justice as correct, the appeal must fail."); *May v. Penn T.V. & Furniture Co.*, 686 A.2d 95, 97 (R.I.1996). Further, we note that, although counsel for Kymberly maintained at oral argument before this Court that Kymberly never *directed* Citizens to divert the funds to the personal account, counsel did acknowledge, with commendable candor, that Kymberly knew that the funds were being diverted to the personal account and also acknowledged that she *did not affirmatively object* to the diversion.

Kymberly also argues that, even presuming the diversion of funds was proper, Citizens could not properly attach the funds in the personal account to satisfy the judgment against Howard, because Citizens was "on notice" that it "was not [Howard's] money;" in support of her ar-

gument, she relies on this Court's decision in *Westerly Community Credit Union v. Industrial National Bank of Providence*, 103 R.I. 662, 240 A.2d 586 (1968).[10] In that case, we stated: "As a general rule[,] a bank may look to deposits in its possession for repayment of any matured indebtedness owed to it on the part of a depositor;" we further noted that this right on the part of a bank "grows out of the contractual relationship existing between the depositor and the bank * * *." *Id.* at 667–68, 240 A.2d at 589. In *Westerly Community Credit Union*, 103 R.I. at 668–70, 240 A.2d at 590–91, we went on to state that, unless a bank has "actual or constructive notice" that funds deposited with it belong to a third party rather than to the depositor, the bank has a right to use those funds to set off debts owed to it by the depositor. On the basis of the just-referenced statement in *Westerly Community Credit Union*, Kymberly argues that, because Citizens was "on notice" that the funds diverted from the Ram corporate account to the personal account did not belong to Howard, it could not use the funds to set off Howard's judgment debt.

In our view, however, the facts at issue in *Westerly Community Credit Union* are tellingly distinguishable from those present in the instant case. The *Westerly Community Credit Union* case involved a check forger who forged signatures on a series of checks from an acquaintance's account at Industrial National. The forger then cashed some of the forged checks at Westerly Community and subsequently deposited back into his acquaintance's account at Industrial National a portion of the money that he received by cashing those checks. *Westerly Community Credit Union*, 103 R.I. at 664–66, 240 A.2d at

---

10. For the sake of conciseness, we shall hereinafter often refer to the two banking institutions involved in the opinion of this Court referenced in the text as "Westerly Community" and "Industrial National" respectively.

588–89. This Court classified the check forger as a "constructive trustee" with respect to the funds that he received by cashing the forged checks and then deposited back into the account at Industrial National, as the funds rightfully belonged to Westerly Community. *Id.* at 668, 240 A.2d at 590. In analyzing whether Industrial National properly could use the deposited funds to set off certain debts of the forger, we stated:

> "In most jurisdictions the right of a bank to apply a deposit consisting of trust funds or funds belonging to one other than the depositor to the individual indebtedness of the depositor, depends upon whether the bank knows or can properly be charged with knowledge of the trust character or true ownership of the funds. * * * It is uniformly held that where a bank has actual knowledge that sums deposited with it belong not to the depositor but to a third party the bank is absolutely precluded from applying such funds against a debt owed to it by the depositor individually." *Id.* at 668–69, 240 A.2d at 590.

In light of the just-quoted language, Kymberly would have this Court view the funds at issue in the instant case as belonging to her as a third party such that the bank could not apply the funds against the debt owed to it individually by Howard. However, the situation at issue in *Westerly Community Credit Union* stands in stark contrast to the factual context of the instant case. The *Westerly Community Credit Union* case involved funds deposited in an account by a "constructive trustee," which funds belonged to a third party (Westerly Community) that was not one of the owners or signatories to the account, whereas in the case before us the funds belonged to Kymberly—and Kymberly was in fact an owner of the joint account at issue rather than a true third party.

Since the time of the *Westerly Community Credit Union* case, we have had the opportunity to consider other cases which presented factual circumstances more closely comparable to those at issue in the instant case—*viz.*, cases in which a banking institution was attempting to use funds held in a joint bank account in order to set off a debt owed by one of the account holders where that account holder had not contributed any of the funds to the account. In one of the cases cited by the hearing justice in the instant case, *Paradis*, we held that a bank could use funds in a joint account that was in the names of a father and daughter in order to set off the daughter's debt to the bank on a defaulted loan, even though all of the funds in the joint account had been deposited by the father. *Paradis*, 651 A.2d at 739–40, 742. In that case, the father had opened two joint accounts in his name and his daughter's, and both signed a signature card for the first account stating that the account was "payable to either or survivor" of the father or daughter. *Id.* at 739. We determined that both the father and the daughter were "vested with the authority to unilaterally withdraw all the funds from the account without the consent of the other," and we noted that the terms and conditions on the back of the signature card gave the bank the right to set off "any indebtedness of depositor to [the bank] against any amount on deposit with [the bank]." *Id.* at 741–42. Accordingly, we concluded that both the father and the daughter could be considered depositors on the account and that, as a result, the bank could lawfully set off funds in the account against the debt owed by the daughter "notwithstanding evidence that all funds were deposited by the [father]." *Id.* at 742.

More recently, in our opinion in *Couture*, 765 A.2d at 832–35, also cited by the

hearing justice in the instant case, we similarly held that a banking institution could reach funds in a married couple's joint accounts in order to set off the mortgage debt of the couple's son, where the couple had added the son as a signatory on their joint accounts. There, we stated that, by signing the signature card for each of the joint accounts, each account holder agreed to the rules and regulations governing the accounts, which included a clause stating that the credit union "may, at its discretion, apply any or all of the funds represented by the certificate against any indebtedness in default which may be owing to it by the [account] holder as an offset against such debt." *Id.* at 832 (brackets in original). We noted that "some depositors open joint bank accounts for estate planning or convenience purposes and * * * in doing so they may expose themselves unwittingly to the type of setoff liability that the [couple] assumed in this case;" we went on to state that "in certain circumstances the enforceability of such a provision may be subject to various equitable defenses, including the doctrine of unconscionability—especially if the depositors' agreement can be characterized as an adhesion contract." *Id.* at 834. However, because the parents in the *Couture* case did not challenge on equitable grounds the credit union's setoff clause and did not make any argument that the provisions on the signature card somehow constituted a contract of adhesion, we determined that the holding in *Paradis* controlled—and we accordingly held that the credit union could set off the son's debts using funds in his parents' joint accounts to which he was also a signatory. *Couture,* 765 A.2d at 834–35.

Kymberly essentially argues that the *Paradis* and *Couture* cases are distinguishable from the instant case because in those cases the signature cards at issue explicitly gave the banks a setoff right, whereas in this case the signature cards for the Ram corporate account and the personal account do not explicitly acknowledge such a right. She further asserts that, unlike the accounts at issue in the just-cited cases, it is unclear from the signature card for the personal account whether that account is in fact a joint account.

Despite Kymberly's contention that it is unclear whether the personal account is in fact a joint account, upon review of the "Personal Signature Card" signed by both Kymberly and Howard on June 26, 2008, it is clear that the personal account is a joint account with Howard being one of the holders thereof—such that Citizens could use those funds to satisfy the judgment that it had obtained against him.

The signature card reads in pertinent part as follows:

"In this signature card, the words *I, me,* and *my* mean *each* Account owner who signs below * * *." (Final emphasis added.)

The card's "Agreement" section further states:

"I am establishing a *joint Account* with right of survivorship in accordance with the terms of the Agreement. Generally speaking, this means that, upon the death of any joint Account owner, the Account balance is owned by the surviving joint Account owner(s), subject to the * * * Bank's *right to set off* funds in the Account * * *." (Emphasis added.)

Although, by contrast with the cards at issue in *Paradis* and *Couture* the personal account signature card at issue in this case is not explicit on its face with respect to the bank's right to set off *in praesenti,* the card in the instant case does unambiguously specify that a joint account had been established, to which Kymberly and Howard had access as signatories—just as did

the signature cards in *Paradis* and *Couture*. Further, the "Agreement" section indicates that the bank had the "right to set off funds in the Account" upon the death of any account owner due to the fact that the owners had established a joint account with right of survivorship. Although it surely would have been preferable for the card at issue in the case at bar to have also made explicit reference to the bank's right to set off *in praesenti*, it is our opinion that the explicit indication that it was a *joint* account was sufficient.[11]

We have consistently held that, under circumstances such as the instant case presents, a bank has a right to use funds in a joint account to set off the debt of one account holder, regardless of whether that holder contributed any funds to the account. We see no cause to depart in this case from that rule of law, and we therefore hold that Citizens had a right to set off Howard's debt with the funds in the joint account to which he and Kymberly were signatories.[12]

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the order of the Superior Court.

The record may be returned to that tribunal.

---

11. We would note that the copy of the personal account signature card contained in the record states:

> "By signing below, I acknowledge that I have read and understand the Bank's deposit account agreement and related fee schedule * * * and any other documents that the Bank provided to me about my Account and any Account services, each as amended from time to time (all collectively and each individually referred to in this signature card as the *Agreement* ). By signing below, I agree to all of the terms of the Agreement." (Emphasis in original.)

However, the "deposit account agreement" and any other documents which comprised the full contractual agreement to which Kym-

berly and Howard were bound, which documents may or may not further address Citizens' right to set off funds, have not been provided by either party.

12. We are mindful of the language in *Couture v. Pawtucket Credit Union*, 765 A.2d 831, 834 (R.I.2001), about "equitable defenses, including the doctrine of unconscionability" being potentially available as defenses against a set-off, "especially if the depositors' agreement can be characterized as an adhesion contract." In the instant case, however, no such equitable defenses have been asserted, nor has there been any allegation that this case involves an adhesion contract.