**Robert LAVOIE, Plaintiff-Appellant,**

v.

**James BIGWOOD et al., Defendants-Appellees.**

**No. 71–1291.**

United States Court of Appeals, First Circuit.

Heard Dec. 6, 1971.

Decided March 3, 1972.

John P. Griffith, Nashua, with whom Hamblett, Kerrigan, LaTourette & Lopez, Nashua, on the brief, for appellant.

Morris D. Stein, Nashua, with whom Stein, Gormley & Morrill, J. Russell Widener, and Guertin & Widener, Nashua, on the brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

According to the complaint and the evidence presented at a brief hearing, plaintiff Robert Lavoie and his family have, since July 5, 1968, rented a space for their mobile home in the Bel Aire Mobile Home Park in Merrimack, New Hampshire, which is owned by defendants James and Rita Bigwood. The complaint states that Lavoie, an active member of a tenants' association, has complained to public officials about defendants' management of the park. For that reason, Lavoie contends, he was given notice, on May 25, 1971, to quit the premises on June 28, 1971. When he did not comply, defendants sought to evict him by filing a Landlord and Tenant writ of summons in municipal court on or about June 29, 1971. In response, plaintiff instituted the present action under 42 U.S.C. § 1983. By agreement of the parties, the eviction proceeding has been stayed pending the outcome of this action.

Defendant takes the position that, as plaintiff is merely a tenant at will, his tenancy can be terminated for any reason by giving thirty days' notice. Plaintiff argues that the otherwise "purely private" relationship between landlord and tenant is transformed by the New Hampshire landlord and tenant and zoning laws, that these laws so infuse the landlord's action that it becomes "state action". Assuming the truth of the claim that eviction was sought in retaliation for the exercise of his rights of speech and association, the district court nevertheless dismissed for failure to state a cause of action, finding simply that defendants' action was not "state action" and therefore did not violate plaintiff's rights under the Fourteenth Amendment.

■■ Preliminarily, a cause of action under § 1983 is stated only if the plaintiff alleges both that a defendant's action is "under color of any statute, ordinance, regulation, custom, or usage, of any State" and that the action subjects the plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ." Where as here, the rights allegedly infringed are the rights of free speech and association guaranteed by the Fourteenth Amendment as it incorporates the First Amendment, the deprivation must take the form of "state action".

■ In addressing the question whether plaintiff has adequately alleged state action, we turn first to the landlord and tenant statute, under which eviction may be sought in three steps. "Any lessor or owner of lands or tenements may at any time determine any lease at will or tenancy at sufferance, by giving to the tenant or occupant a notice in writing to quit the same at a day named therein." N.H.R.S.A. c. 540, § 2. After notice to quit, the landlord may bring a possessory action, N.H.R.S.A. c. 540, § 12, by obtaining a writ of summons, N.H.R.S.A. c. 540, § 13, and then a writ of possession, N.H. R.S.A. c. 540, § 14. On its face the statute thus appears to permit eviction without limitation as to motive, an appearance confirmed by the decisions of the New Hampshire courts, most notably Wormood v. Alton Bay Camp Meeting Association, 87 N.H. 136, 175 A. 233 (1934). In that case, the New Hampshire Supreme Court responded to a claim that the tenant was being evicted for having brought a damage suit against the landlord by declaring that "[t]he motives of the [landlord] in seeking to terminate the tenancy are immaterial . . ." 87 N.H. at 138, 175 A. at 234. Nor does either party in the present case suggest that a motive to evict Lavoie in retaliation for his exercise of his rights of speech and association would be a defense under New Hampshire law in an action for a writ of possession.[1]

New Hampshire delegates its zoning power to the cities and towns of the state:

"For the purpose of promoting health, safety, morals, or the general welfare of the community, the legislative body of any city or town is empowered to regulate and restrict the height, number of stories and size of buildings and other structures, lot sizes, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes." N.H.R.S.A. c. 31, § 60.

The Town of Merrimack has exercised its authority over mobile homes in three quite different ways. It has first imposed ordinary residential restrictions as to lot size, setbacks, and adequacy of sanitary facilities. Another restriction is peculiar to mobile homes: the prohibition "no mobile home shall be located other than in a mobile home park" (Art. VIII, § 2) is coupled with the further prohibition "[n]o mobile home park shall be established or operated without a permit from the Board of Selectmen" (Art.

---

1. Because New Hampshire law is so clear on this point, abstention under Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), would be inappropriate.

VIII, § 3, ¶ A). In consequence of this restriction, the mobile home owner may not purchase land on which to place his mobile home but must rent space on another's land. Finally, and most strikingly, the ordinance states that "[b]efore any permit for a mobile home park shall be issued, the Town Planning Board shall have certified to the Board of Selectmen that the proposed mobile home park will not be injurious or detrimental to the neighborhood in which it is to be situated" (Art. VIII, § 3, ¶ D). The ordinance obviously reflects a concern with the special problems created by mobile homes. Realistically construed, in conjunction with the provision that "[n]o mobile home shall be placed closer than 150 feet to an existing residence" (Art. VIII, § 3, ¶ C(2)), it demonstrates the town's determination that there be metaphorical tracks for a mobile home park to be on the other side of.

■■ As for the implementation of the statute, the record is limited. Plaintiff's attorney did offer to amend the complaint to allege that "there is at least in fact a monopoly created by the town by the way of zoning codes have been enforced so far as mobile home parks, so that in the Town of Merrimack, Mr. Bigwood's park is the only major mobile home park which has been allowed to be put in there . . . ." The court did not rule on this offer, but simply granted permission for Mrs. Lavoie to take the stand. Since she was then permitted to testify concerning her unsuccessful efforts to find a substitute location within thirty-five miles of Merrimack, we will treat the court's action as an implicit acceptance of the amendment.[2] Liberally construed, as is appropriate on a motion to dismiss, the amendment alleges both

that the defendants' park is the sole mobile home park in Merrimack and that the town has denied permits to others who wished to open additional parks.

The critical issue, whether the confluence of court-enforced eviction and monopoly power created by zoning sufficiently implicates the state to be termed state action, must be resolved by reference to unsynthesized lines of cases. The chaotic state of the doctrine is particularly unfortunate where, as here, the state is involved in more than one way in the challenged action, and it is unclear whether we ought to measure the voltage as if the actions were in series or as if in parallel.

Conventionally, there is thought to be a line somewhere between two "polar propositions": that under the Fourteenth Amendment, a state may not deprive a person of his constitutional rights; and that a person may for any reason discriminate against other persons in his private affairs.[3] The notion that these are polar propositions has led courts, in cases involving nominally private actions, to explore from each pole in order better to locate the equator. With the "state action" pole are associated such phrases as "state compulsion or involvement",[4] and with the opposite pole, state "neutrality"[5] and "purely private"[6] or "merely private"[7] conduct. In attempting to sort out the uses of these phrases, we recognize that in the broadest senses of the words, the states are always involved in private actions, are never pristinely neutral.

Viewing the problem, for the moment, as one of defining "neutrality" in a less strict sense, we turn to Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed.

---

2. A lengthy list of realtors, landowners, and other mobile home parks contacted as part of this effort was introduced into evidence. None of the parks is identified as being located in Merrimack, but the notation is sketchy.

3. *See, e. g.,* Adickes v. S. H. Kress & Co., 398 U.S. 144, 169, 90 S.Ct. 1598, 26 L. Ed.2d 142 (1970).

4. Adickes v. S. H. Kress & Co., *supra,* 398 U.S. at 169, 90 S.Ct. 1598

5. Reitman v. Mulkey, 387 U.S. 369, 376, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

6. Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

7. Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

1161 (1948), where the Court found "state action" in the enforcing by a state court of a racially restrictive covenant. *Shelley* and its implications have been the subject of extensive discussion, which we do not propose to recapitulate.[8] In arriving at our own interpretation, we are aided by the discussion in Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964). In that case a deputy sheriff had ordered certain black patrons to leave a privately-owned amusement park, had arrested them when they refused to do so, and had brought a prosecution for criminal trespass. The Court recounted Maryland's argument that it

> "may . . . constitutionally enforce an owner's desire to exclude particular persons from his premises even if the owner's desire is in turn motivated by a discriminatory purpose. The State, it is said, is not really enforcing a policy of segregation since the owner's ultimate purpose is immaterial to the State." 378 U.S. at 136, 84 S.Ct. at 1773.

The Court responded that such were not the facts of the case before it, in that "The president of the corporation which owned and managed the park testified that he had instructed [the deputy sheriff] to enforce the park's policy of racial segregation." 378 U.S. at 136–137, 84 S. Ct. at 1773. A state, then, must be more strictly neutral than to permit any of its officers to identify the subjects of the discrimination in the first instance. Although it was not cited in *Griffin,* we take *Shelley* to be an earlier application of the same principle. To enforce the covenant and thereby disrupt a transaction between a willing seller and a willing buyer, the state court had necessarily to take evidence that the prospective buyer was black and to take notice that the clause being enforced was a racially restrictive one.

But while, on the facts of *Shelley* and *Griffin,* the Court had no occasion to announce a narrower theory indicating when a state police officer or court is "neutral" for the purposes of the Fourteenth Amendment, we think that, apart from cases involving racial discrimination,[9] Maryland's argument suggests a workable theory. That is, a state may at the behest of private persons apply sanctions pursuant to general rules of law which have discriminatory as well as non-discriminatory application if it does not accept the responsibility of employing a discriminatory classification. Such responsibility would exist when, in resorting to a state sanction, a private party must necessarily make the state privy to his discriminatory purpose. Similarly, in such a case as this, the state would retain a neutral posture unless it

---

8. *See, e. g.,* Bell v. Maryland, 378 U.S. 226, 318, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (Black, J., dissenting); Edwards v. Habib, 130 U.S.App.D.C. 126, 397 F.2d 687 (1968); Black, Foreword: "State Action", Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69 (1967); Henkin, Shelley v. Kraemer: Notes For A Revised Opinion, 110 U.Pa. L.Rev. 473 (1962); Pollak, Racial Discrimination and Judicial Integrity: A Reply to Professor Wechsler, 108 U.Pa. L.Rev. 1 (1959).

9. In his dissenting opinion in Adickes v. Kress, *supra,* 398 U.S. at 188, 90 S.Ct. 1598, Justice Brennan argued that several cases, Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963), Lombard v Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963), and Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964), "together hold that a state policy of discouraging privately chosen integration or encouraging privately chosen segregation, even though the policy is expressed in a form nondiscriminatory on its face, is unconstitutional and taints the privately chosen segregation it seeks to bring about." 398 U.S. at 194–195, 90 S.Ct. at 1622. Of course, the *Adickes* majority did not adopt Justice Brennan's view—the historical dimension of "encouragement", upon which he relied, may not signify a departure from neutrality. If it does, however, such historical or structural encouragement as a component of state action may indicate one sense in which the Fourteenth Amendment, as an enactment directed against racial discrimination, should be accorded broader scope in extirpating that discrimination. Pilate may wash his hands of some stains more convincingly than of others.

was necessarily apprised of the landlord's purpose to violate rights of free speech and association. While not entirely satisfactory, this approach at least recognizes conscious state involvement without insisting upon an unattainable purity.

■ On our analysis of "neutrality", then, an ejectment in retaliation for the exercise of First Amendment rights is, without more, "purely private" action.[10] The state simply affords the landlord a method of vindicating his property rights without inquiring as to the landlord's motive in doing so, indeed without accepting evidence of his motive if offered. The matter does not end here, however. The state, through its instrumentality the Town of Merrimack, has restricted the placement of mobile homes through a zoning ordinance. Viewed in light of the foregoing discussion of neutrality, of course, the zoning ordinance changes nothing. In restricting mobile homes to mobile home parks, the state and the town know nothing of the reasons for which a park owner will flex his propertied muscles. Nonetheless, the neutralitly perspective is not a comprehensive one, as is clear from the "state involvement" and community replica cases to which plaintiff also calls our attention.

Plaintiff argues from Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and McQueen v. Druker, 438 F.2d 781 (1st Cir. 1971), that Merrimack's regulation of mobile homes betokens a measure of state involvement adequate to constitute "state action". So stated, the argument would apply to all zoning. As a matter purely of detailed specifications, the requirements imposed on other sorts of buildings in other zones are substantially as complicated as those imposed on the owners of mobile home parks. What was critical in *Burton* and *McQueen*, and is lacking here, is a continuing interrelatedness on both the financial and operational levels.

In making a slightly different argument, plaintiff cites Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and Amalgamated Food Employees Union Local 590 v. Logan Val. Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).[11] At base his contention is that since the owner of a complete town (including business and residential sections) was held subject to the Fourteenth Amendment in *Marsh,* and the owner of "the community business block" was similarly charged in *Logan Plaza*, the owner of a residential section should be held to the same standard. Despite the attractive symmetry of the argument, we do not understand *Marsh* and *Logan Valley* to go so far.[12] The Court emphasized in *Marsh* that the area in question was "freely accessible and open to the people in the area and those passing through", 326 U.S. at 508, 66 S.Ct. at 279, and quoted this passage in *Logan Plaza,* 391 U.S. at 319, 88 S.Ct. 1601. Defendants here do not seek to attract persons to their property or to make it the center of activity or communication in Merrimack. At least so far as the record reveals, their trailer park is in this respect no different from an ordinary apartment building.

10. *Accord*, Mullarkey v. Borglum, 323 F. Supp. 1218 (S.D.N.Y.1970). *But see* Hosey v. Club Van Cortlandt, 299 F.Supp. 501 (S.D.N.Y.1969); *cf.* Edwards v. Habib, *supra* (constitutional discussion as aid to statutory interpretation).

11. *See also*, Tanner v. Lloyd Corp., 308 F. Supp. 128 (D.Or.1970), aff'd 446 F.2d 545 (9th Cir. 1971), cert. granted, 404 U.S. 1037, 92 S.Ct. 703, 30 L.Ed.2d 728 (1972) (protection accorded distribution of leaflets at a shopping center).

12. In this connection, we note but do not assign weight to the denials of certiorari in two cases in which the New York state courts had found no "state action". Dorsey v. Stuyvesant Town Corp., 299 N.Y. 512, 87 N.E.2d 541, cert. denied, 339 U.S. 981, 70 S.Ct. 1019, 94 L.Ed. 1385 (1950) (privately owned housing development for 25,000); Watchtower Bible & Tract Soc'y v. Metropolitan Life Ins. Co., 297 N.Y. 339, 79 N.E.2d 433, cert. denied, 335 U.S. 886, 69 S.Ct. 232, 93 L.Ed. 425 (1948) (privately owned complex of apartment buildings for 35,000).

We find more to the point than the cases pressed upon us by the plaintiff, a line of cases which began with Railway Employes' Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). *Hanson* upheld over a First Amendment challenge § 2, Eleventh of the Railway Labor Act, which authorizes railroads and labor organizations to enter union shop agreements, under which employees must join the union within sixty days of commencing employment. 45 U.S.C. § 152(11). The Court reached the First Amendment question only after finding "governmental action":

> "The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." 351 U.S. at 232, 76 S. Ct. at 718.[13]

*Hanson* was reaffirmed in International Ass'n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), in which the Railway Labor Act was construed, "to avoid serious doubt of [its] constitutionality", 367 U.S. at 749, 81 S. Ct. at 1790, as forbidding unions to spend dues for political purposes over the objection of individual members. And in what the plurality opinion characterized as a case presenting "a claim of impingement upon freedom of association no different from that which we decided in [*Hanson*]", 367 U.S. at 842, 81 S.Ct. at 1837, the Court held that the Wisconsin Supreme Court's requirement that an attorney must be a member of the integrated state bar association if he wished to practice law was not unconstitutional. Lathrop v. Donahue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961).

The possible relevance of *Hanson* and its progeny to the present case is that here, as in those cases, the government has allegedly placed monopoly power in private hands in order to implement other policies.[14] Much as federal legislation supporting a private agreement made it a condition of employment with a particular employer to join a certain union, and the Wisconsin rule made it a condition of practicing law in that state that a lawyer join the integrated bar association, Merrimack has, according to plaintiff's allegation, made it a condition of living in a mobile home there that the plaintiff, locate his mobile home in defendants' mobile home park.

In none of the cases, of course, is there demonstrated a state purpose to restrain speech by limiting alternatives, but neither is the private power entirely fortuitous. In authorizing union shops, Congress apparently sought "industrial peace and stabilized labor-management relations", Railway Employes' Dept. v. Hanson, *supra*, 351 U.S. at 234, 76 S.Ct. at 719; in requiring membership in an integrated bar association, Wisconsin hoped to "[raise] the quality of professional services", Lathrop v. Donahue, *supra*, 367 U.S. at 843, 81 S.Ct. at 1838. Here, the ordinances themselves amply demonstrate that Merrimack restricts mobile home owners, apparently for esthetic, and perhaps for tax, reasons, in ways which it

---

13. The *Hanson* "government action" rationale was interpreted by this court, in Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971), to apply to union shop agreements negotiated under the Labor Management Relations Act as well as those negotiated under the Railway Labor Act, even though the LMRA expressly permits states to outlaw union shop agreements. 29 U.S.C. § 164(b). *Accord*, Gray v. Gulf, M. & O. R. R., 429 F.2d 1064 (5th Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 461, 27 L.Ed.2d 451 (1971).

14. We find little guidance in Public Utilities Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), a pre-*Hanson* case in which the court found "governmental action" in the programming of speaker systems on the buses of a private transit company enjoying a near monopoly. The Court's disclaimer of reliance on the transit company's monopoly position, 343 U.S. at 462, 72 S.Ct. 813, is adequately explained by the existence of a clear and narrower ground, specific government consideration and approval of the challenged programming. *Cf.* Justice Harlan's interpretation, Evans v. Newton, 382 U.S. 296, 320, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (Harlan, J., dissenting).

does not restrict those who prefer to live in conventional houses. As in the labor and bar cases, the possible inhibition of speech is entirely collateral to the primary purpose for which restrictions are imposed.

This similarity of purpose is coupled with a similarity of effect not eroded by the obvious factual distinctions. The opportunity for families of modest means to live in a mobile home near the breadwinner's place of work in a particular town is not demonstrably less important than the opportunity to work for a particular employer. Mobile home sites may be available at great remove, but so may other jobs of similar description be available with other employers. Nor would the conferring of power on a single individual seem to differ in any relevant respect from the conferring of power on an organization such as the integrated bar.

A distinction of arguably greater significance is that the labor and bar cases involved forced association with the attendant danger that membership dues would be used to support political candidates or programs despite opposition from particular members, while the forced tenancy here is more likely to chill a tenant's speech than to augment the landlord's. But to note that the constitutional dangers are different is not to negate the similarity of the cases for state action purposes—in each case one private party, who may act with impunity, is granted the power to put another private party to a choice between his rights of speech or association and his job or home.

 The juxtaposition of our conclusions that the state is neutral within the meaning of one line of cases and implicated within the meaning of another line leads us to focus again on the applicability of the "polar" analysis. In *Burton*, in *Hanson*, and in each of the cases which followed them, the state or federal government was neutral in the sense that the law it enforced was not unconstitutional on its face. A simple, and for present purposes, at least, an adequate generalization to be drawn from these cases is that a neutrality test is inapposite where the state gives special support to a nominally private party or, for other purposes, markedly restricts alternatives to dominion by a private party. Accordingly, we find that appellant has adequately alleged "state action" in asserting a town purpose to restrict sites for mobile homes and a concomitant private monopoly over the allocation of those sites.[15]

We make two further observations. In finding that plaintiff has alleged state action on a *Hanson* theory, we necessarily hold that, at least for this plaintiff, who has no practicable alternative, other sorts of housing are not interchangeable with mobile homes.[16] Beyond this we decline to generalize, but simply note the similarity of the problem to that of defining a product market in antitrust law. More importantly, we do not prejudge the case, because the allegations before us do not warrant it, where, although a town has granted several permits, demand is so strong that, with a restrictive purpose, the town grants permits for a limited number of substantial parks, but more than one, which are together inadequate to meet the demand. We think it beyond question, on the other hand, that where no such purpose is shown or can fairly be

---

15. We do not, of course, mean to intimate that the creation of monopoly by zoning is unconstitutional. The constitutionality of local zoning has repeatedly been upheld, *e. g.*, Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), with no indication that any different result would be reached where one private party owned all of the land zoned for a particular use.

16. The record demonstrates that ejectment would have a severe impact on the plaintiff. In particular, he has very modest means, supports three children, has little employment flexibility because his job classification is rare, could expect little cash return from the sale of his mobile home, and would be unable to afford the monthly rent for a dwelling suitable for a family of five.

inferred, a mere showing that housing of a particular description is in short supply does not establish "state action".

The perplexing question which remains to be addressed is whether the facts which constitute "state action" also satisfy the "under color of" law clause of § 1983. The Supreme Court, in summarizing, seemed to answer the question affirmatively in United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966): "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment", 383 U.S. at 794 n. 7, 86 S. Ct. at 1157. But subsequently, in Adickes v. S. H. Kress & Co., *supra,* both Justice Harlan for the majority, 398 U.S. at 171, 90 S.Ct. 1598 (by implication), and Justice Brennan in dissent, 398 U.S. at 210, 90 S.Ct. 1598, indicated that, at least in some cases, "under color of" law requires more than "state action". The question has not been considered by the Supreme Court in the context of speech or association, because the cases have arisen in other postures, as appeals from state court injunctions, *e. g.,* Railway Employes' Dept. v. Hanson, *supra,* Amalgamated Food Employees Union Local 590 v. Logan Val. Plaza, *supra,* or as appeals from state court trespass convictions, *e. g.,* Marsh v. Alabama, *supra.* That is, in resisting an injunction or conviction, a defendant relies on the Fourteenth Amendment, which requires only a showing of "state action". It is only when one seeks to take the initiative as a § 1983 plaintiff that he must show not only "state action" but also "color of law".

A partial explanation for the Court's treatment of "under color" in *Adickes* was that it faced a novel question concerning the proper meaning to be accorded "under color of . . . custom". The restaurant had simply refused to serve Miss Adickes, but had not called upon the state to arrest her or to prosecute her under the state's trespass law. Justice Harlan noted that "[a]lthough such a trespass statute might well

have invalid applications if used to compel segregation of the races through state trespass convictions, see Robinson v. Florida, 378 U.S. 153, [84 S.Ct. 1693, 12 L.Ed.2d 771 (1964)], the statute here was not so used in this case", 398 U.S. at 161 n. 23, 90 S.Ct. at 1610, and declined to decide whether mere knowledge of the statute without invocation of its sanctions would amount to action "under color of . . . statute". The "color of . . . statute" is hardly so faint here; we think that an ejectment action instituted to punish the exercise of a tenant's rights of speech and association by a mobile home park owner whose monopoly has been created by zoning is an "invalid application" of the New Hampshire landlord and tenant statute. *Cf.* McQueen v. Druker, *supra; see also,* Tanner v. Lloyd Corporation, *supra,* 308 F.Supp. at 131. That the plaintiff has not yet been evicted, proceedings having been stayed pending the outcome of this case, is no bar where the tenant concededly has no defense in the ejectment action.

Reversed.