**Barbara FLETCHER et al., etc.,
Plaintiffs, Appellants,**

**v.**

**RHODE ISLAND HOSPITAL TRUST
NATIONAL BANK et al.,
Defendants, Appellees.**

**No. 73–1372.**

United States Court of Appeals,
First Circuit.

Argued March 5, 1974.

Decided May 9, 1974.

928

James L. O'Neill, Providence, R. I., with whom Bucci, O'Neill & Coia and Ralph J. Gonnella, Providence, R. I., were on brief, for appellants.

Edwin H. Hastings, Providence, R. I., with whom Tillinghast, Collins & Graham, Providence, R. I., was on brief, for Old Stone Trust Co., appellee.

Stephen A. Fanning, Jr., Providence, R. I., with whom Deming E. Sherman and Edwards & Angell, Providence, R. I., were on brief, for Rhode Island Hospital Trust National Bank and BankAmericard Assn. of Rhode Island, Inc., appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Barbara Fletcher had a checking account at the Rhode Island Hospital Trust National Bank, and Marion Sass had such an account at the Old Stone Trust Co. Both have alleged in a complaint filed in the district court that, without request, the respective banks sent them each a BankAmericard; that each bank later claimed an indebtedness arising from use of the card; and that each bank, without notice to the cardholder or her approval, set off the amount in her checking account against the debt from use of the card.[1]

Neither plaintiff alleges that she did not owe the card indebtedness to the bank at the time her deposit was set off in partial satisfaction. Rather each contends that the set off was unconstitutional because without notice and hearing, see Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and, alternatively, that the failure to disclose the right to set off when issuing the credit card was in violation of the Consumer Credit Protection Act (the Act), 15 U.S.C. § 1637(a)(7). Damages, an injunction, and a declaration are sought. Upon defendants' motion, the district court dismissed for failure to state a claim, F.R.Civ.P. 12(b)(6), and plaintiffs appealed.[2]

I

Count 1, the constitutional claim, belongs to a growing number of post-Fuentes attacks on private collection procedures. Brought under 42 U.S.C. § 1983, it alleges that "the right of banker's set off against deposit funds as recognized and enforced in the common law and not prohibited in the statutory law" violates the Fourteenth Amendment by authorizing seizure of deposited funds without prior notice and opportunity to be heard. The district court held, however, that the banks' actions were not "under color of" state law within the meaning of § 1983.[3] Citing "overwhelming authority at the present time" that repossession of goods under a conditional sales contract, pursuant to Section 9–503 of the Uniform Commercial Code, is not state action, it said,

"the exercise by the defendant banks of their common-law right of set off is . . . even farther [sic] re-

---

1. Barbara Fletcher's card indebtedness was allegedly $796.36, and Marion Sass' $982.44. The checking account balances set off were $291.30 and $73.98. The complaint alleges that the checking account balances "represented the only liquid form of property available" to each, and that they depended upon them "for providing the maintenance of [their] wellbeing".

2. Fletcher and Sass filed a joint notice of appeal pursuant to F.R.A.P. 3(b) and, therefore, both parties are properly before the court.

3. 42 U.S.C. § 1983: "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

moved from any state involvement. . . . Here we do not even have . . . the enactment of a statute. These actions by the defendants were purely private actions in furtherance of their private interest."

■ It is not disputed that a claim under § 1983 requires "state action". Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). A defendant, as the statute provides, must have acted "under color of" state law; and for a plaintiff to be deprived of a right secured by the Fourteenth Amendment, the state itself, not a mere private party, must have taken property without due process of law.[4]

Plaintiffs would have us find state action from (1) the sanctioning in Rhode Island of the practice of bank set off, and (2) the state's own involvement with the banking industry. We shall discuss the two theories separately. As did the district court, and as have most other federal courts, including the second, eighth and ninth circuits, in analogous self-help cases, we conclude that the challenged action was private, not state, and so we affirm the dismissal of Count 1. See Bichel Optical Laboratories, Inc. v. Marquette Nat'l Bank, 487 F.2d 906 (8th Cir. 1973); Jojola v. Wells Fargo Bank, No. C–71 900 SAW

(N.D.Cal. May 8, 1973); cf. Bond v. Dentzer, 494 F.2d 302 (2d Cir. 1974); Adams v. Southern Cal. First Nat'l Bank, 492 F.2d 324 (9th Cir. 1973); Shirley v. State Nat'l Bank, 493 F.2d 739 (2d Cir. 1974).[5]

*State Sanction of Set Off*

In Westerly Community Credit Union v. Industrial Nat'l Bank, 103 R.I. 662, 667–668, 240 A.2d 586, 589–590 (1969), the Supreme Court of Rhode Island stated,

"As a general rule a bank may look to deposits in its possession for repayment of any material indebtedness owed to it on the part of a depositor. [citation omitted] Such a right grows out of the contractual relationship existing between the depositor and the bank which arises at the time the depositor delivers and commits money to the bank's custody. . . . The right of a bank to apply deposits to extinguish a debt owed to it by a depositor is referable to principles of equity and in some states receives additional support from statutory law; . . . ."

Plaintiffs argue that recognition of set off changed the common law so as to allow a bank to deprive citizens of property without resort to courts.[6] But we

4. "State action" and "under color of" state law are usually treated as one and the same, although analytically there may be a difference. Adickes v. S. H. Kress & Co., 398 U. S. 144, 210, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring in part); Lavoie v. Bigwood, 457 F.2d 7, 15 (1st Cir. 1972). Arguably, the seizure here, being sanctioned by Rhode Island law, was "under color" thereof, but was not state action in the Fourteenth Amendment sense as there was no deployment of state process or machinery on behalf of the creditor banks. Cf. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S. Ct. 1820, 23 L.Ed.2d 349 (1969). We do not attempt any such refined analysis but use "state action" in both senses interchangeably.

5. See also Kinch v. Chrysler Credit Corp., 367 F.Supp. 436 (E.D.Tenn.1973); Johnson

v. Associates Finance, Inc., 365 F.Supp. 1380 (S.D.Ill.1973); Nichols v. Tower Grove Bank, 362 F.Supp. 374 (E.D.Mo.1973); Shelton v. General Electric Credit Corp., 359 F.Supp. 1079 (M.D.Ga.1973); Pease v. Havelock Nat'l Bank, 351 F.Supp. 118 (D.Neb. 1972); Kirksey v. Theilig, 351 F.Supp. 727 (D.Colo.1972); Greene v. First Nat'l Exch. Bank, 348 F.Supp. 672 (W.D.Va.1972); Oller v. Bank of America, 342 F.Supp. 21 (N. D.Cal.1972); McCormick v. First Nat'l Bank, 322 F.Supp. 604 (S.D.Fla.1971). Contra, Gibbs v. Titelman, 369 F.Supp. 38 (E.D.Pa.1973); Boland v. Essex County Bank & Trust Co., 361 F.Supp. 917 (D. Mass.1973); Straley v. Gassaway Motor Co., Inc., 359 F.Supp. 902 (S.D.W.Va.1973).

6. The complaint requests only a declaration of unconstitutionality of that "portion of its common law." Rhode Island had adopted provisions of the Uniform Commercial Code which tangentially recognize "any right" of

disagree that *Westerly* reflects a break with tradition. Plaintiffs rely upon cases dealing with set off as a pleading device, a different matter. As used here to describe a banker's right growing from his contract to offset mutual debts, the term refers to a familiar self-help practice (once called a "right of stoppage") that has been accepted for years in this country. *See* Studley v. Boylston Bank, 229 U.S. 523, 527–528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913). A Rhode Island case decided half a century before *Westerly* makes reference to the practice, Hungerford v. Curtis, 43 R.I. 124, 110 A. 650 (1920), which is in no way unique to Rhode Island. *See* 10 Am.Jur. 2d Banks § 666 (1963); 9 C.J.S. Banks and Banking § 295 (1938). *See generally* United States v. Butterworth-Judson Corp., 267 U.S. 387, 394–395, 45 S.Ct. 338, 69 L.Ed. 672 (1925); New York County Nat'l Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904).

That a creditor should refuse to pay out money for one who already owes him a debt is not surprising. Had the banks not been able to do so without signalling their intentions, the funds might have gone swiftly, and there would have been no other assets to satisfy the banks' claims. In any event, whatever the truth of the old saw that possession is nine-tenths of the law, a creditor who holds something of value to his debtor is differently situated from one who does not: he does not need the state to facilitate his collection efforts.

The cases upon which plaintiffs must rely contain the further ingredient of the state's having helped in the seizure of the debtor's property. In *Fuentes* the state court issued writs of replevin and these were executed by state officials. The creditor could obtain the property peacefully only by the affirmative intervention of the state. In footnote 12, the *Fuentes* court recognized the difference between a state's lending process to a creditor and a creditor's proceeding "without the use of the state power, through self-help, by 'distraining' the property before a judgment." *Id.* at 79. Similarly in Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), a garnishment writ was issued by a state court clerk.[7]

Yet notwithstanding Rhode Island's lack of instrumental assistance, plaintiffs maintain that the state creates, enforces, or encourages "the impetus" for the private actions, and thus "acts" even though it may not be involved with the banks or the challenged action. *See, e. g.,* Adickes v. S. H. Kress & Co., 398 U.S. 144, 170, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *cf.* Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). We do not believe, however, that Rhode Island's mere passive acceptance of a bank's ability to help itself is encouragement enough to constitute state action. There are myriad more or less conventional private property rules which a state may define, codify or—as here—simply acknowledge. In the ordinary case such state judicial or legislative activity in the economic sphere is not, by itself, state action. Rhode Island has done no more than announce acceptance of a familiar private practice. She has not created or encouraged it. Her courts have not even addressed

set off a bank may have, but do not establish or define such a right. R.I.G.L. Title 6A, § 4–213(4), (5).

7. In Hall v. Garson, 430 F.2d 430 (5th Cir. 1970), a state law authorizing a landlord to execute a lien transferred to a private party power traditionally reserved to the sheriff. The instant case involves no such usurpation of an historic state function. *See also* Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (challenged procedures prescribed by state); Boland v. Essex County Bank, *supra* (self-help likely to involve close working arrangement with police); Santiago v. McElroy, 319 F.Supp. 284 (E.D.Pa.1970) (state officers perform distress sales). *But see* McCabe v. Atchison, T. & S. F. Ry., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914) (statute permitting railway to discriminate); Collins v. Viceroy Hotel Corp., 338 F.Supp. 390 (N.D.Ill.1972) (innkeeper lien law); Klim v. Jones, 315 F.Supp. 109 (N.D.Cal. 1970) (innkeeper lien law).

themselves to the procedural aspects of set off.

In Moose Lodge No. 101 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), a state's granting of liquor licenses to clubs practicing private discrimination was held not to be such encouragement of the practice as to involve the state significantly. "[W]here the impetus for the discrimination is private the State must have 'significantly involved itself . . .' to fall within the ambit of the constitutional prohibition." *Id.* at 173. The impetus for bank set off is private, and we fail to see how the state's passive acquiescence amounts to involvement beyond that present in Moose Lodge. *See also* Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970).

█ Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), lends the greatest theoretical support to the argument that a state's common law doctrine may amount to state action. The Court held unconstitutional an amendment to California's constitution providing that the state could not limit a person's right to sell or rent his real property to whomever he chooses. The amendment was aimed at state laws curbing racial discrimination in housing. The Court held that the amendment not only altered the law but significantly involved the state in racial discrimination. In the instant case, however, Rhode Island has not acted affirmatively to terminate protections once afforded to bank depositors. Its legislature remains unfettered to regulate or eliminate bankers' set off should it choose. Finally, *Reitman* stands as an outer marker. "[A]n extension of *Reitman* . . . would subject most private conduct to fourteenth amendment standards", including virtually all contractual relations and testamentary dispositions. Comment, Power of Sale Foreclosures after Fuentes, 40 U.Chi.L. Rev. 206, 218 (1972). In *Reitman* the Court seemed to recognize the unique limitations of its decisions, commending the California court because

"[i]t did not read either our cases or the Fourteenth Amendment as establishing an automatic constitutional barrier to the repeal of an existing law . . .; nor did the court rule that a State may never put in statutory form an existing policy of neutrality with respect to private discriminations." *Id.* at 376.

We question if a case forged from the nation's continuing struggle with the cancer of racial discrimination can in every particular be transferred to one dealing with bankers' set off. *See* Adams v. Southern Calif. First Nat'l Bank, *supra* at 333; Shirley v. State National Bank, *supra* at 744–745. As Judge Friendly has suggested, "[R]acial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts . . . ." Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970) (concurring opinion). We conclude that bank set off is a private self-help remedy. Rhode Island's involvement therewith is too slight to constitute state action.

## *Involvement of State with Banks*

█ As an alternative approach, plaintiffs would have us find state action from the state's participation in the affairs of private banks. Relying upon such terms as "quasi-monopoly", "symbiotic relationship", "joint venture", and the like, plaintiffs emphasize that banks are regulated and serve important public needs. The question is not, however, to be answered by slogans. We have to examine specifics in order to determine whether in engaging in the challenged practice the banks are so "endowed by the state with governmental powers or functions . . . that they were considered in essence agencies or instrumentalities of the state and consequently

subject to constitutional limitations." Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d 153, 161 (6th Cir. 1973).

The mere fact that banks are closely regulated by the state, R.I.G.L. Title 19, § 1–1 et seq., and federal government [8] does not render all they do state action. *Moose Lodge* holds, in essence, that a state's ability to regulate or prohibit a practice it has chosen to ignore, although it regulates other activities of the defendant, does not constitute state action.

> "[T]he state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury."

Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968); *cf.* Particular Cleaners, Inc. v. Commonwealth Edison Co., 457 F.2d 189 (7th Cir. 1972). We find nothing contrary in Public Utilities Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); a government commission had investigated and approved the challenged programming.

Plaintiffs seek to draw support from cases [9] finding state action when a public utility terminates service to a nonpaying customer. In *Palmer*, the sixth circuit found that the gas company, which had entered upon private property pursuant to a state statute, enjoyed a total monopoly, provided a necessity of life and, in performing a public function, exercised powers usually reserved to the state. Such a corporation belongs to a category sometimes called "quasi-public". Having been granted a monopoly over a vital public service it may be visualized as doing what the state itself might otherwise have to do. *See* Note, Fourteenth Amendment Due Process in Terminations of Utility Services for Nonpayment, 86 Harv.L.Rev. 1477 (1973). There is little parallel to the defendant banks. While banks are termed "quasi-monopolies" by plaintiffs, they exist in sizable number. To the extent that the limitation upon licenses, R.I.G.L. Title 19, § 1–5, confers a "monopoly", the banks are no different from the holders of liquor licenses in *Moose Lodge*. Furthermore, as already discussed, the set off procedure, unlike the utility's statutory right of entry on private premises, carries no special grant of power. When a utility was able to cut off services without entry upon private property, no state action was found —the court holding that "affirmative support must be significant." Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972), cert. denied, 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973). Finally, the credit and banking services made available to plaintiffs, valuable though they may be, are not basic necessities of life.

Appellants are no more successful in their attempt to place themselves within Lavoie v. Bigwood, 457 F.2d 7 (1st Cir. 1972).[10] In that case we held that the

---

8. One of the defendant banks, we are told, is a National Bank. Federal regulation is irrelevant to the issue of state action under § 1983. While federal officers may, at times, be subject to suit for unconstitutional behavior, *see* Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L. Ed.2d 619 (1971), there is no cause of action against private parties acting under color of federal law or custom.

9. *See, e. g.*, Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d 153 (6th Cir. 1973); Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir.), vacated as moot, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); Bronson v. Consolidated Edison Co., 350 F.Supp. 443 (S.D.N.Y.1972); Hattell v. Public Service

Co., 350 F.Supp. 240 (D.Colo.1972); Stanford v. Gas Service Co., 346 F.Supp. 717 (D.Kan.1972). *Contra*, Jackson v. Metropolitan Edison Co., 483 F.2d 754 (3d Cir. 1973); Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972), cert. denied, 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973).

10. The holding in Lavoie, supra, was based upon Railway Employe's Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), which is inapplicable to the instant situation. In *Hanson*, the federal government placed monopoly power in private (union) hands in order to implement federal labor policies. Rhode Island, on the other hand, has given the banks no monopoly pow-

confluence of court-enforced eviction and monopoly power created by zoning so implicated the state as to subject a private mobile home park owner to suit under § 1983. A condition of living in any mobile home in the area was that plaintiff locate his trailer in defendant's mobile home park.

> "[A] neutrality test is inapposite where the state gives special support to a nominally private party or, for other purposes, markedly restricts alternatives to dominion by a private party." *Id.* at 14.

In the instant case, Rhode Island is not alleged to have given special support to the defendant banks nor has it in any way restricted plaintiffs' alternatives.

The symbiotic relationship described in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961), does not exist here. In *Burton* the land and the building containing the offending restaurant were publicly owned. There were close physical and business relationships between lessor and lessee. The Court found that the profits earned by discrimination practiced in the restaurant were an indispensable element in the financial success of a government agency. Although the defendant banks undoubtedly contribute to the general revenue like all other corporate taxpayers no particular agency or program of the state is financially tied to their profitability. Rhode Island does not provide the property on which the bank is located nor contribute in any direct way to its operation. The state has not "insinuated itself into a position of interdependence". *Id.* at 725.

Appellants maintain that the comprehensive system of monitoring carried out by the state has inextricably intertwined Rhode Island with the banks' activities. Yet McQueen v. Drucker, 438 F.2d 781 (1st Cir. 1971), cited in support of this proposition, expressly disavows reliance on financial subsidy and regulation. The government chose to use private persons to carry out a specific governmental objective—providing for urban renewal displacees. Insofar as appellants ask us to limit *Moose Lodge* to private social clubs, we decline to accept a distinction which could lead to finding state action in all forms of commercial enterprises open to the public and would totally eviscerate the state action doctrine. Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), is so plainly distinguishable on its facts as to require no discussion. "Open to the public" should not be confused with "public function." *See* Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

As all the arguments considered together or individually analyzed are insufficient to raise a colorable claim under § 1983, the court correctly dismissed on the pleadings under Rule 12(b)(6). *See generally* Shirley v. State Nat'l Bank, *supra*; Kirksey v. Theilig, 351 F. Supp. 727 (D.Colo.1972); Greene v. First Nat'l Exchange Bank, 348 F.Supp. 672 (W.D.Va.1972).

## II

In Count 2, plaintiffs allege that under § 127(a)(7) of the Consumer Credit Protection Act, 15 U.S.C. § 1637(a)(7), and § 226.7(a)(7) of Regulation Z, 12 C.F.R. 226.7(a)(7), defendants were supposed to disclose the conditions under which they might retain or acquire any "security interest" in the property of the plaintiffs, and to describe the security interest. Plaintiffs further allege that the privilege of set off exercised by the banks is a security interest, and that either the banks did not disclose and describe it or else whatever was disclosed was not made "clearly, conspicuously or meaningfully" as required.[11]

---

er. Moreover, the union shop agreement was legal only because the federal act had nullified state right-to-work laws.

11. 15 U.S.C. § 1631(a):

"Each creditor shall disclose clearly and conspicuously, in accordance with the regula-

The district court ruled that the bank's common law set off right was not a security interest within the meaning of 15 U.S.C. § 1637(a)(7). Noting that the legislative history provided no aid on the question,[12] it pointed out that pursuant to authority of § 105 of the Act, 15 U.S.C. § 1604, the Board of Governors of the Federal Reserve System had promulgated regulations defining "security interest" as "any interest in property which secures payment or performance of an obligation." 12 C.F.R. § 226.2 (z).[13] The court went on to say,

"In my opinion it is palpably clear the status of a depository bank, vis-a-vis deposited funds, is that of a debtor, not that of a secured creditor. The indebtedness of the plaintiffs, and that of others similarly situated, arose from transactions completely unrelated to the deposit of their money in the respective defendant banks. With regard to this indebtedness the banks are unsecured creditors. This is evidenced by the fact that the depositor is at all times free to withdraw his funds from the bank. The exercise by a bank of its long-recognized right to apply deposited funds against such indebtedness is nothing more than the setting-off of mutual, unsecured debts. To accept the plaintiffs' contention that the right to set-off is 'in the nature of a security interest' would be to stretch the meaning of that term beyond reasonable limits."

We regard the question as somewhat closer than did the district court, but we reach the same conclusion.

Plainly a banker's privilege to apply the debt arising from a deposit against a depositor's unrelated debt to the bank is not a security interest in the ordinary sense.[14] *See* United States v. Sterling Nat'l Bank, 360 F.Supp. 917 (S.D.N.Y. 1973). *But see* United States v. Harris, 249 F.Supp. 221 (W.D.La.1966). A deposit of money to one's credit in a bank, although it may give rise to a set off allowing the bank to obtain more than other general creditors, "is not a transfer of property as a payment, pledge, mortgage, gift or security." *New York County Nat'l Bank, supra,* 192 U.S. at 147. A security interest arises usually when the creditor retains an interest at the time he extends credit. Here the depositor extended credit to the bank when she made her deposit; under Rhode Island law, as the district court stated, the money deposited belongs to the bank and the bank stands in a debtor-creditor re-

tions of the Board, to each person to whom consumer credit is extended and upon whom a finance charge is or may be imposed, the information required under this part."

15 U.S.C. § 1637(a):

"Before opening any account under an open end consumer credit plan, the creditor shall disclose to the person to whom credit is to be extended each of the following items, to the extent applicable: . . .

(7) The conditions under which the creditor may retain or acquire any security interest in any property to secure the payment of any credit extended under the plan, and a description of the interest or interests which may be so retained or acquired."

12. *See generally* 1968 U.S.Code Cong. & Admin.News, p. 1962; 113 Cong.Rec. 18399 (1967); 114 Cong.Rec. 1831, 14375, 14486 (1968); Warren & Larmore, Truth in Lending: Problems of Coverage, 24 Stan.L.Rev. 793 (1972).

13. 12 C.F.R. § 226.2(z):

" 'Security interest' and 'security' means any interest in property which secures payment or performance of an obligation. The terms include, but are not limited to, security interests under the Uniform Commercial Code, real property mortgages, deeds of trust, and other consensual or confessed liens whether or not recorded, mechanic's, materialmen's, artisan's, and other similar liens, vendor's liens in both real and personal property, the interest of a seller in a contract for the sale of real property, any lien on property arising by operation of law, and any interest in a lease when used to secure payment or performance of an obligation."

14. " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation." Uniform Commercial Code § 1–201(37).

lation to its depositor. *Westerly Community Credit Union, supra,* 103 R.I. at 668, 240 A.2d at 589. When the bank extended credit, it acquired no new collateral. Even if the bank had a policy of extending credit only when savings had reached a certain level, and therefore considered the savings to be collateral for the extension of credit, the savings were not deposited for the purpose of creating a security interest and obtaining the credit. Unlike the case with commercial transactions secured by accounts receivable or contract rights, the bank as creditor does not acquire the debtor's right to payment. It has, instead, a right as debtor to refuse payment, thereby limiting loss. This wholly negative quality is foreign to secured transactions which give to the creditor an affirmative right to receive or retain something—money, tangible property, or performance of a contract. The principal draftsman of Article 9 of the Uniform Commercial Code criticized § 9–104(i) thereof, which excludes set off from its coverage, because

> "[o]f course a right of set-off is not a security interest and has never been confused with one: the statute might as appropriately exclude fan dancing." 1 G. Gilmore, Security Interests in Personal Property § 10.7 at 315–16 (1965).

For such an unusual application to be read into the term "security interest", especially in a statute with civil penalties, we think Congress, or at least the Federal Reserve Board as the agency invested with power to issue regulations, should first say so. The defendant banks are otherwise not forewarned as to the illegal conduct. It is true that the list of security devices in Regulation Z does not purport to be exhaustive; nonetheless, the Board undertook to specify a wide variety of devices, none of which—though some are not security interests in the strict sense—include the cancellation of mutual debts.

We recognize that a persuasive argument can be found in the protective purpose of the Act. Whatever its technical niceties, set off from a consumer's view is arguably similar to conventional security interests. Like any of them, it may be a significant term of the credit transaction. As Judge Moore wrote in N. D. Freed Co., Inc. v. Board of Governors, 473 F.2d 1210, 1214 (2d Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed. 2d 61 (1973),

> "The avowed purpose of the Consumer Credit Protection Act, enacted in 1968 after eight years of Congressional consideration, was to 'assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.' [15 U.S.C. § 1601.]"

In shopping for credit, a potential card holder might well like to know that if she uses a card from her own bank, her checking account will be the security in an everyday, if not legal, sense.

Yet in deciding *Freed,* the second circuit was aided not only by reference to the Act's remedial purpose but by a particularized legislative history and by the language of a Board regulation. Indeed, the issue before the court was simply whether or not to sustain a regulation adopted by the Board. The regulation reflected "contemporaneous construction of a statute by the agency charged by Congress with the administration of the Act." *Id.* at 1217. *See* Gardner & North Roofing & Siding Corp. v. Board of Governors, 150 U.S.App.D.C. 329, 464 F.2d 838 (1972); Douglas v. Beneficial Finance Co., 334 F.Supp. 1166 (D.Alaska 1971), rev'd on other grounds, 469 F.2d 453 (9th Cir. 1972). In the instant situation, the Board has not spoken at all on set off as a security interest.

■ Furthermore, last summer a Senate committee reported out amendments to the Act dealing for the first

time with set off, but not under the heading of a "security interest". Senate Comm. on Banking, Housing, and Urban Affairs, Rep.No.93–278, 93d Cong., 1st Sess. 9 (1973). The bill, which has passed the Senate, rather than modifying the current disclosure section, treats the practice in a new chapter dealing with credit billing. 14 Cong.Rec.S. 14414 (daily ed. July 23, 1973). It would prohibit set off unless the cardholder agrees to permit the bank periodically to pay the indebtedness by deducting appropriate amounts from the cardholder's account.[15] The author of the amendments, Senator Proxmire, was also a principal sponsor of the Act; the way set off is handled in the amendments gives little support to any notion that the original Senate sponsors envisaged it to be a security interest. Moreover, set off procedures differ somewhat between states, and the proposed legislation would deal more sensitively than can a court with the varying problems of regulation. Thus, there is good reason not to outpace Congress but to await its judgment. We conclude that set off is outside the Act's present compass.

No issue is raised on appeal concerning the class action aspects of this litigation. Since no class determination was made by the district court, the dismissal affirmed by us is not, of course, *res judicata* as to any of the alleged class members.

Affirmed.

15. S.2102, 93d Cong., 1st Sess. § 169 (1973) :
   "(a) A card issuer may not take any action to offset a cardholder's indebtedness arising in connection with a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer unless—
   "(1) such action was previously authorized in writing by the cardholder in accordance with a credit plan whereby the cardholder agrees periodically to pay debts incurred in his open end credit account by permitting the card issuer periodically to deduct all or a portion of such debt from the cardholder's deposit account, and
   "(2) such action with respect to any outstanding disputed amount not be taken by the card issuer upon request of the cardholder.
   "In the case of any credit card account in existence on the effective date of this section, the previous written authorization referred to in clause (1) shall not be required until the date (after such effective date) when such account is renewed, . . .
   "(b) This section does not alter or affect the right under State law of a card issuer to attach or otherwise levy upon funds of a cardholder held on deposit with the card issuer if the remedy is constitutionally available to creditors generally."